CHARLES SCUDDER & others *vs.* SAMUEL CROCKER & others.

On the 12th of April, 1837, the two firms of H. L. & Co. and C. & R., (the members of the latter being also members of the former,) severally made assignments under the act of 1836, *c.* 238, to the same assignees, F. B., W. A. F. S. and G. A. C., for the benefit of their respective creditors: The assignment of C. & R. purported to convey all their property, both as partners and as individuals, to be sold and disposed of by the assignees, and the proceeds thereof distributed among all the creditors of C. & R., and the creditors of each of them, and among all who might become their creditors, or the creditors of either of them, by reason of any then existing note, acceptance, indorsement, or liability, and who should become parties to the instrument, in the proportion of their just claims and demands against C. & R., or against C. or R. : This assignment was executed by C. & R., the assign-

ors, and by the assignees, but not by any of the creditors of C. & R., or of either of them, and nothing was ever done under it by the assignees. On the 27th of December, 1837, the T. I. Co., a corporation consisting of the same individuals who composed the firm of H. L. & Co., which had been incorporated on the 7th o March, 1837, and in which C. & R. were owners of two thirds of the stock, was duly organized: On the 2d of January, 1838, the T. I. Co. purchased of the as signees of H. L. & Co. all the assets, and entered into a contract with the as signees to pay all the debts, of H. L. & Co.: On the 10th of January, 1838, C. & R. addressed a circular to their creditors, requesting an extension, upon certain terms and conditions therein proposed, which being acceded to by the greater number of the creditors, an arrangement was made accordingly for the purpose, by an instrument dated July 1st, 1838, and signed by the creditors between that day and the 22d of March, 1839, and by a conveyance, on the last named day, by C. & R. to trustees named therein, for the benefit of their creditors: The propositions of C. & R. were, that all their creditors, whose demands exceeded $500, should receive the notes of C. & R. therefor, payable in equal sums, in one, two, and three years, from the 1st of July, 1838, with interest annually, and that all other creditors should receive notes of C. & R., payable in equal sums in three, six, and nine months; that C. & R. should be allowed to retain in their own hands and have the free·disposal of a certain portion of the property embraced in the assignment of April 12th, 1837, as a capital for going on with their business; and that the residue should be placed in the hands of trustees, as security for the ultimate payment of the notes so to be given: By the instrument of July 1st, 1838, (which was not to take effect, unless all the creditors whose demands exceeded $500, should become parties to it,) the creditors exonerated the trustees under the assignment of April 12th, 1837, from all liability to them by reason thereof, and (C. & R. consenting) appointed F. B., W. A. F. S., and N. C., trustees, to receive and hold the property (specifying the same, together with the estimated value thereof) proposed by C. & R. to be placed in the hands of trustees; and the instrument then provided, that, in case C. & R. should fail to pay their notes in the manner proposed, the property might be sold by the trustees, and the proceeds thereof applied to such payment: The deed of March 22d, 1839, conveyed all the property mentioned in the instrument of July 1st, 1838, (including the shares of C. & R. in the T. I. Co.,) to the trustees and for the purposes therein named and set forth; with a condition, that if C. & R. should pay their creditors, in the manner and at the times agreed upon, and the trustees for their services, the conveyance should be void: In pursuance of the arrangement thus effected, C. & R. made a settlement accordingly with the greater part of their creditors, whose debts exceeded $500, but not with their other creditors: The trustees, at the request of C. & R. and for the purpose of enabling them to pay their first year's notes due July 1st, 1839, released to them certain portions of the trust property, on an understanding with C. & R. that they should place in the hands of the trustees evidence of a payment of notes by them to the amount of the property released: With the proceeds of the property so released, and other funds of their own, C. & R. paid the first year's notes, at maturity, with the exception of four (for the non-payment of which by C. & R., there did not appear to.be any particular reason, other than the accidental neglect or delay of the holders in demanding payment), and soon afterwards delivered to the trustees, as vouchers for the property released by them, an equal amount of the notes so taken up: It did not appear, that the trustees were ever called upon to pay any claims not paid by C. & R.; or that any complaint was made to them by any creditor, on account of such non-payment; or that they were ever required by the creditors, or any of them, to take possession and dispose of the trust property, in consequence of non-payment by

Scudder & others *v.* Crocker & others.

C. & R.: The trustees made no further disposition of the trust property, until February, 1841, after which date, sales were made from time to time under their authority as trustees; and the property was finally disposed of by them, and the proceeds paid to the clerk, in pursuance of an order of the court, passed in August, 1843: On the 7th of December, 1841, proceedings in insolvency were instituted against C. & R. on the application of certain of their creditors, in pursuance of which all their property, both partnership and individual, was taken possession of and assigned, and C. & R. received their certificates of discharge, on the 23d of February, 1843: The plaintiffs brought their bill in equity, on the 4th of April, 1842, against C. & R. and their trustees and assignees, for an account of the property assigned as above mentioned, and a distribution thereof among the creditors of C. & R.: The trustees having answered the bill, and exhibited an account of their receipts and expenditures, and of their proceedings relative to the trust, a decretal order was passed at the November term, 1844, by agreement of the parties, by which the indenture of April 12th, 1837, was adjudged to be inoperative, and the deed of March 22d, 1839, valid and effectual; and by which the cause was referred to a master, to ascertain and report upon the state and amount of the fund in court, — what disposition had been made of the property assigned, — what had been the proceedings of the trustees, and what compensation they ought to receive, — together with the names of the creditors of C. & R. who should prove their claims before him, and the amount due each on account of claims existing on the 12th of April, 1837, " though the evidence of such claim or claims may have changed since that day: " The order also directed the master to ascertain and report, whether any creditor had received from the property conveyed by the deed of March 22d, 1839, more than one third of his demand, as due on the 12th of April, 1837, and, if so, the excess; which excess, the order declared, should be considered a payment *pro tanto* of any dividend, to which such creditor might otherwise be entitled.

The master having made his report with reference to the several matters referred to him, and various exceptions having been taken thereto, it was held:

1. That it was not the effect of the decretal order to give a judicial construction to the deed of March 22d, 1839; but that the order was framed with a view to the ascertaining of such facts, as might enable the court to determine upon the rights of the parties, according to the legal construction, which might subsequently be given to the deed.

2. That the deed of March 22d, 1839, was so far connected with and dependent upon the assignment of April 12th, 1837, that the property conveyed by the former was to be held by the trustees, as security for the payment of the same debts, which were to have been paid under the latter.

3. That the instrument of July 1st, 1838, and the deed of March 22d, 1839, were to be considered as parts of one and the same transaction, and construed together.

4. That the arrangement thus effected was not the creation of a trust fund absolutely appropriated for the payment of the notes to be given by C. & R. in settlement with their creditors; but that such notes were to be paid by C. & R. out of their own funds and means.

5. That payments, by C. & R., of their first instalment notes, from whatever sources the means of making the same might be derived, did not constitute a claim on the fund; and, if made out of the fund, with the consent of the trustees, such payment was a misappropriation, for which the trustees were responsible.

6. That those of the creditors of April 12th, 1837, who had not since received any part of their claims, were not entitled to a preference as to one third, in the distribution of the fund, over other creditors one third of whose claims had been so paid; and that if any creditor had received more than one third of his claim, the

excess was not to be regarded as a payment *pro tanto*, in advance, of any future dividend to which he might be entitled.

7. That the deed of March 22d, 1839, was a mortgage, defeasible by the payment of their notes, &c., by C. & R., which gave the trustees no power to sell the property thereby conveyed, until after a breach of the condition.

8. That, upon a breach of the condition, the trustees had power to sell the property, and, with the proceeds, to pay the debts; but that they were not bound to sell the same immediately, at its then market value; that they were to exercise a discretion, as to the time and manner of sale; and that, in disposing of the property, they were only answerable for the exercise of good faith and sound judgment.

9. That it did not appear that there was any breach of the condition in July, 1839, or, if there were, that notice of it was given to the trustees.

The T. I. Co., having been allowed by the master to prove as a creditor of C. & R against the fund, it was held:

1. That if H. L. & Co. on the 12th of April, 1837, were indorsers or sureties for C & R., and afterwards paid the debts for which they were so liable, they would thereby become creditors of C. & R. under the assignment of April 12th, 1837.

2. That, by the assignment of the assets of H. L. & Co. to the T. I. Co., the latter took an equitable title thereto, with all the immunities, privileges and benefits, to which the same were entitled, and subject to the charges, equities, rights of set-off, and counter claims, to which they were subject, in the hands of the assignees of H. L. & Co.

3. That, under the peculiar circumstances of the case, if the T. I. Co., as the successor and assignee of H. L. & Co., had any claims, either legal or equitable, as a creditor of C. & R., under the provisions of the trust deed, it was no objection to its being allowed to prove as such, that C. & R. were members of the firm of H. L. & Co., and also shareholders in the T. I. Co.

The T. I. Co. having been allowed to prove, before the master, as a creditor of C. & R., within the terms of the decretal order, for payments of notes signed or indorsed by H. L. & Co., or by the T. I. Co. as their successor and assignee, to which notes C. & R. were also parties, either as promisors or indorsers, it was held:

1. That, if, on any of the notes so taken up by the T. I. Co., H. L. & Co. were in fact the principal debtors, and C. & R. sureties, such payments were not provable against the fund.

2. That, if, on any such notes, which were in existence on the 12th of April, 1837, C. & R. were, in fact, the principal debtors, and H. L. & Co. sureties, and such notes remained specifically, and were paid by the T. I. Co. as debts of H. L. & Co., such payments were provable against the fund.

3. That, if any such notes, which were in existence on the 12th of April, 1837, on which C. & R. were principal debtors, and H. L. & Co. sureties, had been taken up by the former, by giving their own notes therefor, with the indorsement or signature of the T. I. Co., in place of the preëxisting indorsement or suretyship of H. L. & Co., and the last mentioned notes were paid by the T. I. Co., such payments were a new credit, by the T. I. Co. to C. & R., and, consequently, not provable against the fund.

The T. I. Co. having been allowed to prove, on account of payments made from its funds, to discharge debts of C. & R. existing on the 12th of April, 1837, it was held, that if the credit of the T. I. Co. had been loaned by its officers to C. & R. in the form of indorsements which were used by C. & R. for the payment of such

debts, and the T. I. Co. paid the notes so indorsed, such payments created a new debt from C. & R. to the T. I. Co. without giving the latter any claim, legal or equitable, by way of substitution, against the fund.

The T. I. Co. having been allowed to prove for a balance of account, which was due from C. & R. to H. L. & Co. on the 12th of April, 1837, and had been carried forward on the books of H. L. & Co., and of the T. I. Co.., and included as the first item of debit in four several accounts rendered by the T. I. Co. to C. & R. from the 30th of April, 1838, to the 30th of April, 1841; it was held, that this balance was provable against the fund, unless it had been paid or liquidated, since the original entry thereof, by means of subsequent dealings and transactions between the parties; and that charging the same in a new account of a subsequent date, or the rendering of such an account, was not such a liquidation; but. that if subsequent dealings and transactions had taken place between the parties in the course of which new credits were given, and debts made, new accounts were stated and rendered, and the balance carried from time to time to new account, and the aggregate of the payments, on general account, in such subsequent transactions, without or beyond any specific appropriation or application thereof, exceeded the balance so debited and claimed, the same must be considered as thereby liquidated and absorbed.

The T. I. Co. claimed before the master, as a debt due from C. & R. to H. L. & Co., a sum of money, taken by the common assignees on the 3d of November, 1837, from the assets of H. L. & Co., and appropriated by them to pay a debt of C. & R., for the purpose of preventing the sale and consequent sacrifice of certain stock belonging to the assets of C. & R., which was pledged as collateral security for the debt so paid; and it appearing, that, for the purpose of raising money for the use of C. & R., a new debt was immediately contracted, in favor of the same creditor, by whom the stock continued to be held as collateral security therefor, and that the stock was never redeemed, but ultimately sold by the holder, for a price less than the debt for which it was pledged, it was held, that this was not a debt provable against the fund.

----

The trustees, in their answer, claiming to be discharged from further accounting for certain items of property included in the trust deed, on the ground, that the same, not having been delivered to them at the time of the conveyance, had never since come into or been placed in their hands, it was held:

1. That as to certain shares in the T. M. Co. which were pledged as collateral security for a debt of C. & R., and, not having been redeemed by them, were subsequently sold for less than the sum for which they were pledged, the trustees were no further answerable.

2. That, as to certain shares in the C. Bank, which were pledged as collateral security for a debt of C. & R. to the bank, but which were recognized and treated by the bank as the property of C. & R , to whom the dividends were paid, by whose direction the shares were subsequently sold and transferred, and by whom the proceeds, after payment of the debt to the bank, were appropriated to their own use and in part to the payment of a debt existing on the 12th of April, 1837, the trustees were accountable, notwithstanding the shares did not stand in the names of C. & R.; it not appearing, that the trustees could not, at any time, have caused the shares to be disposed of, and have appropriated the proceeds, after payment of the bank, to the purposes of the trust.

3. That, as to the interest of C. & R. in certain shares of the W. I. Co., being the amount paid by C. & R. towards their subscription for the same, (no certificates thereof having then been issued, but which, when issued, were to be delivered to the trustees,) which interest was afterwards sold by C. & R. at an advance the

trustees were accountable; it not appearing, that they had ever applied for the certificates, or had given notice to the company of the conveyance to them, or taken any measures to avail themselves of C. & R.'s interest in the shares.

The trustees, in their account, claimed an allowance for certain shares in the B. P. W., included in the trust deed, which, as they alleged, had since become of no value, and in reference to which it appeared, that in 1838 the shares began to depreciate, — that in 1839 and afterwards they could not be sold at all, — that in 1839 the corporation was insolvent, — and that in 1841 an assessment was laid on the shareholders, to meet the liabilities of the corporation: it was held, that the trustees were entitled to the allowance claimed.

The trustees made a like claim as to certain shares in the T. I. Co., which had not been salable for some years, in consequence of the stockholders having become personally responsible for debts and liabilities, by reason of a neglect to comply with the laws relating to manufacturing corporations: it was held, that the trustees were entitled to such allowance.

The trustees, in their account, claimed to discharge themselves from further accounting for certain portions of the trust property, which they had released to C. & R.; in order to enable them, with the proceeds thereof, to pay their first year's notes, by crediting themselves with and producing a number of the first year's notes, which had been taken up by C. & R. equal in amount to the sum with which the trustees had charged themselves, as vouchers for the value of the property so released: it was held, that the trustees were not authorized to dispose of the trust property in the manner and for the purpose stated, and that they were bound to account therefor.

The trustees claimed compensation for their services under the assignment of April 12th, 1837: it was held, that they were not entitled thereto out of the fund.

The trustees claimed, as a compensation for their services, in making sales, &c., under the trust deed, and for making sales of property in pursuance of the order of court, a commission of five per cent, amounting to $6438·80, on the whole amount of sales, namely, $128,766·28: the sum claimed was held to be unreasonably large, and the sum of $5000 substituted therefor.

THIS was a bill in equity, brought by Charles Scudder, Thomas F. Cordis and David W. Horton, a firm doing business under the name and style of Scudder, Cordis and company, in behalf of themselves and all other creditors of Samuel Crocker and Charles Richmond, late partners in business under the firm and style of Crocker and Richmond, against the said Samuel Crocker and Charles Richmoi 1, and certain persons, their assignees and trustees, name.y, Francis Baylies, William A. F. Sproat, George A. Crocker, Nathaniel Crandell,·(since deceased,) Charles J. Holmes, and Lovett Morse.

The subject of the bill, and the subsequent proceedings thereon, which gave rise to the questions before the court, will appear from the following statement.

The first named defendants, Samuel Crocker and Charles Richmond, for some time previous to the 12th of April, 1837, had been engaged in extensive business in Taunton, as partners, under the firm and style of Crocker and Richmond. Finding themselves embarrassed and unable to meet the demands against them, they, on that day, undertook to make an assignment of all their property, both joint and individual, for the benefit of their creditors, according to the provisions of the act of 1836, *c.* 238, "to regulate the assignment and distribution of the property of insolvent debtors." In order to effect this object, an indenture of three parts, by and between Crocker and Richmond, of the first part, three of the other defendants, Baylies, Sproat and George A. Crocker, of the second part, and the various persons, creditors of Crocker and Richmond, who should become parties thereto, of the third part, was executed by the parties of the first and second part, on the 12th of April, 1837.

This indenture purported to convey and assign all the property and estate, of every description, (a schedule of which was to be afterwards made out,) belonging to Crocker and Richmond, either as partners or as individuals, to the assignees, Baylies, Sproat and Crocker, in trust, to be sold and disposed of, and the proceeds thereof, after payment of the expenses, and a "just compensation to the trustees, for their services and responsibility in the premises," to be distributed among the creditors of the assignors. The clause relating to the distribution was in the following terms:

"The residue, &c., the said party of the second part shall pay and legally distribute to and among all the creditors of the said firm of Crocker and Richmond, and Samuel Crocker and Charles Richmond, and all who may become their creditors, or the creditors of either of them, by reason of any now existing note, acceptance, indorsement, or liability for them, and who shall become parties to this instrument, in the proportion of their just claims and demands against the said firm of Crocker and Richmond, or against the said Samuel Crocker or Charles Richmond."

28*

This instrument was not executed by any of the creditors of Crocker and Richmond, and nothing was ever done under it by the trustees; but the property covered by it remained in the hands of the assignors, and under their control and management, as before.

At the same time with this assignment, another firm established in Taunton, under the name and style of Horatio Leonard and company, of which Crocker and Richmond were members, also made a similar assignment, for the benefit of creditors, to the same trustees. Subsequently, the members of the firm of Horatio Leonard and company were incorporated as the Taunton Iron Company, and in that character became the purchasers of the assets, under an obligation to pay the debts, of Horatio Leonard and company, as will be more fully stated in another part of the case.

This continued to be the situation of the affairs of Crocker and Richmond, until the 10th of January, 1838, when they addressed a circular letter to their creditors, making certain statements and propositions, relative to their affairs and to the payment of their debts. In this paper, Crocker and Richmond represented to their creditors, that, in consequence of the general depression of business then prevailing, which rendered the collection of debts difficult, and the disposition of their property impracticable, except at ruinous prices, they had been unable to liquidate their debts and resume business as they had expected. They proposed to their creditors, therefore, to allow them further time for payment, by receiving their notes, payable by equal instalments in one, two and three years, with interest annually, for all debts, which, with the interest thereon, on the 1st of July then next, should exceed $500, and for all debts which should then fall short of that sum, notes payable in like manner in three, six and nine months. To secure the ultimate payment of the notes thus to be given, which they estimated would amount to $380,000, they proposed to place in the hands of trustees certain enumerated articles of property, estimated at $665,878·75, and to retain in their own hands, relieved

from the incumbrance of the assignment above mentioned, and as a capital for going on with their business, and meeting their engagements under this arrangement, certain other property estimated at $304,724·48.

These propositions being generally acceded to by the creditors, the arrangement proposed was carried into effect by means of an instrument dated July 1st, 1838, and executed by most of the creditors between that day and the 22d of March following, and a deed of the latter date from Crocker and Richmond to Baylies and Sproat, two of the former trustees, and Nathaniel Crandell, one of the defendants, as trustees.

By the first named instrument, the creditors, after a recita. of the propositions of Crocker and Richmond and their acceptance thereof, fully and unconditionally discharged and exonerated the assignees under the indenture of April 12th, 1837, from all liability to them as such, and authorized, constituted and appointed Baylies, Sproat and Crandell (provided Crocker and Richmond should consent and unite therein), to act as trustees to receive and hold the property proposed by Crocker and Richmond to be placed in the hands of trustees for the benefit of their creditors. The instrument then proceeded to enumerate the several items of property alluded to, together with the estimated value thereof, and concluded in these terms:

" That, in case the said Crocker and Richmond should fail to pay their several debts in the manner proposed, the said property may be sold, and the proceeds of the sale applied to that purpose, giving them, the said trustees, full authority to do the same, and to make and execute all the legal and necessary instruments to constitute them trustees as aforesaid, and to enable them to execute the said trusts, provided all the creditors, whose claims shall exceed $500, shall become parties to this instrument."

By the deed from Crocker and Richmond to Baylies, Sproat and Crandell, dated March 22d, 1839, the grantors conveyed all and singular the property mentioned in the instrument

above described, (with one or two exceptions,) to the grantees therein named, and the survivors or survivor of them, to be held in trust for the purposes of the agreement between Crocker and Richmond and their creditors, recited in the said instrument, namely : "for securing the payment of the several notes of hand, which they should give in pursuance of said agreement, payable in equal sums for all debts, obligations, and demands, exceeding five hundred dollars, in one, two and three years, from the first day of July now last past, with interest, and for all debts, obligations and demands of a less amount than five hundred dollars, their notes payable in equal sums, in three, six and nine months from the said first day of July, and interest."

This deed contained and concluded with the following clause :

"Now, therefore, if we, the said Samuel Crocker and Charles Richmond, our heirs, executors or administrators, shall well and truly pay to our several creditors the full and just amount of their debts, in the manner and on the days above mentioned, and otherwise faithfully comply with the terms of our several agreements, as above mentioned, and pay to them, the said trustees, their survivors or survivor, as aforesaid, a just and reasonable compensation for their services and expenditures, in executing said trust, then and in that case this deed to be void, otherwise to remain in full force and virtue."

On the day of the execution of this deed, the grantees therein, Baylies, Sproat and Crandell, signed a paper certi-fying to the creditors, that all the real and personal estate (enumerating the same), which Crocker and Richmond had agreed to convey for the benefit of their creditors, had been conveyed to, and placed in the hands of, the grantees.

In pursuance of the arrangement thus entered into, Crocker and Richmond effected a settlement with the most of their creditors whose demands exceeded $500, by giving their notes therefor, dated July 1st, 1838, and payable in one, two and three years, with interest annually. No notes appear to

have been given in settlement of the demands of $500, and under, as was also stipulated in the agreement.

The trustees held the property thus conveyed to them, without making any sale or other disposition of any part thereof, until a short time previous to the 1st of July, 1839, when the first year's notes, or the first instalment notes, as they were called, became due. When the time for this payment was approaching, Crocker and Richmond applied to the trustees to release to them a part of the property in their hands, in order to enable the former to meet the payment of this instalment. The trustees acceded to the request, and accordingly released to Crocker and Richmond eighty-one shares in the stock of the Taunton Branch Railroad Company, valued at $7614, and sixty shares in the stock of the Taunton Iron Company, valued at $60,000, with the proceeds of which and funds of their own, Crocker and Richmond paid the first year's notes amounting to $100,000, and upwards; being all the notes then due, with the exception of four, which were afterwards paid by the trustees, but, for the non-payment of which by Crocker and Richmond, there did not appear to be any particular reason, other than the accidental neglect or delay of the creditors in demanding payment. This relinquishment was made by the trustees, upon the understanding that Crocker and Richmond should place in their hands evidence that they had paid notes, which had been given according to the terms of the trust deed, to an amount equal to the value of the property so released.

No further sale or disposition of the property was made by the trustees, until February, 1841, from which time until the close of the year 1843, sales were made to about the amount of $20,000. The residue of the property, remaining in their hands, was sold by the trustees under a decree of this court, made in the present cause on the 18th of August, 1843, and the proceeds thereof were paid into the hands of the clerk.

On the 1st of April, 1841, Crocker and Richmond made a further deed to Baylies, Sproat and Crandell, by which they confirmed their former conveyance of March 22d, 1839, and explained and enlarged the powers thereby conferred.

On the 7th of December, 1841, certain creditors of Crocker and Richmond made an application to the judge of probate for the county of Bristol, praying that proceedings in insolvency might be instituted against them. The application was allowed by the judge, and a warrant was accordingly issued on the same day, upon which possession was taken by a messenger of all the property of the debtors, both partnership and individual. A meeting of the creditors was subsequently held, at which the defendants, Charles J. Holmes and Lovett Morse, were chosen assignees, and the judge of probate thereupon conveyed to them all the property of the insolvents. In pursuance of these proceedings, Crocker and Richmond received certificates of discharge from all their debts, partnership as well as individual, on the 23d of February, 1843. Those of the creditors, who proved their demands against Crocker, were paid thereon a dividend of twenty per cent.

The bill in this cause was filed on the 4th of April, 1842. As originally drawn, it prayed for an account of the property, which was assigned by the indenture of April 12th, 1837, and a distribution thereof to and among the creditors of Crocker and Richmond, according to the provisions of the act of 1836, c. 238. The defendants filed answers setting forth, in substance, the facts already stated. The plaintiffs then amended the bill, so as to present their claim to an account and distribution, in the alternative, namely, either under the indenture of April 12th, 1837, or under the arrangement which was completed by the deed of March 22d, 1839, according as the court should adjudge them to be entitled.

The amended bill was demurred to by George A. Crocker, for multifariousness; and Baylies and Sproat moved, that the plaintiffs should be required to elect on which ground they would proceed, namely, on the indenture of April 12th, 1837, or the arrangement of March 22d, 1839. The court overruled the demurrer, and disallowed the motion; and the defendants thereupon answered the bill. In their answers, the defendants set forth the transactions between Crocker and Richmond, and their assignees and trustees, and the proceedings of the

latter relative to the property in their hands, together with their accounts of sales of the same, and of their disbursements, expenses and commissions.

At the November term, 1844, by the consent and agreement of the parties, the court passed a decretal order in the cause, the material parts of which, necessary to be here stated, are as follows:

It was, in the first place, ordered, adjudged and decreed thereby, that the indenture of April 12th, 1837, had become and was inoperative and no longer in force; that the deed of March 22d, 1839, was valid and effectual to convey the property therein mentioned, to the parties and for the purposes stated in the same, and that the trustees were bound to account for such property, in this suit, to the plaintiffs and all other persons and corporations, who should become parties thereto, and who were creditors of Crocker and Richmond on the 12th of April, 1837; and that the deed of April 1st, 1841, was valid and confirmatory of the deed of March 22d, 1839.

It was then further ordered and decreed thereby, that the cause, with the bill, answers, orders and proofs therein, be referred to George S. Hillard, Esquire, one of the masters in chancery for the county of Suffolk:

1. To ascertain and report upon the state and amount of the funds, deposited in the hands of the clerk, by order of the court, in this cause, and who is entitled to the same.

2. To ascertain and report what has become of the property conveyed by the deed of March 22d, 1839; whether the same has been accounted for according to the provisions of the deed, or of any order of the court; and, if any part of the same remain unaccounted for, what it is, why it has not been disposed of, and who is accountable therefor; whether the trustees have diligently and faithfully performed the duties undertaken by them in accepting the trust; and what sum, if any, should be allowed them for their services and disbursements in the execution thereof.

3. To ascertain and report what sums were due from the defendants, Crocker and Richmond, to the plaintiffs in this

suit, on account of any claim or claims existing on the 12th of April, 1837; and to give notice, as specified in the order, to all persons and corporations, who were creditors of Crocker and Richmond, on account of any claim existing on the 12th of April, 1837, to come before the master, and prove their demands, on or before a day to be fixed by him, on pain, if they should neglect to do so, of being wholly excluded from participating in the trust fund created by the deed of March 22d, 1839.

4. To ascertain and report the names and give a description of all the creditors of Crocker and Richmond, who should come in and prove their claims, as aforesaid, and the amount due each, respectively, on account of such claims as existed on the 12th of April, 1837, "though the evidence of such claim or claims may have been changed since" that day.

5. To inquire and report whether any and which of the creditors are secured by a pledge or mortgage, and, if so, what is the value of the security in each case; to deduct such value from the amount of the debt so secured, and to report the balance only as a claim against the fund.

6. To inquire and report whether any and what creditors have received, from the property conveyed in trust by the deed of March 22d, 1839, more than one third of the amount of their several demands, as the same existed on the 12th of April, 1837, (that being the proportion supposed to have been subsequently paid to the creditors according to the arrangement completed by the deed aforesaid); such excess to be considered as a payment, *pro tanto*, of any dividends, to which the creditors receiving the same might otherwise be entitled.

In pursuance of this order, the master proceeded to the discharge of his duties under the same, and passed upon the claims of a great number of creditors, which were offered for proof before him, and upon the proceedings and accounts of the trustees, and made his report upon the several matters so submitted to him, on the 19th of June, 1847. Several of the claims made before the master, and adjudicated upon by him,

having been contested at the hearing, on various grounds, the master, at the request of the parties, inserted a statement of the facts relating to such contested claims, together with his decision thereon, in his report.

The plaintiffs, for themselves and the creditors generally, filed exceptions to the report, on the ground of the allowance by the master of the claims of certain creditors therein specified, and of the allowance of certain particulars in the accounts and proceedings of the trustees; certain creditors, whose claims were allowed in part, filed exceptions because their claims were not allowed in full; and the trustees filed exceptions, on the ground, that certain charges contained in their accounts against the fund were disallowed by the master.

The various claims and accounts, which were the subjects of controversy before the master, and of the exceptions taken to his report, together with the facts relating thereto, so far as the same are material to be here stated, and as they appear from the master's report, and other documents in the cause, are as follows.

The assignees of the Taunton Iron Company presented an account, consisting of a great number and variety of particulars, most of which were proved before the master and allowed by him against the fund. Some of the claims offered for proof by the same claimants were disallowed in part and others rejected altogether.

In reference to these claims, generally, it appeared before the master, that, previous to the 12th ʳᶠ April, 1837, the two commercial houses of Crocker and Richmond, and Horatio Leonard and company, the latter engaged in the iron business as manufacturers and dealers, and the former in general commerce, were established and doing business in Taunton; that Crocker and Richmond were at the same time partners in the firm of Horatio Leonard and company, the other members of which were Horatio Leonard, George Leonard, Charles Robinson, I. Robinson and E. Robinson; that, on the 12th of April, 1837, both these firms failed, and assigned their property for the benefit of creditors, pursuant to the act of

1836, *c.* 238, to the same assignees, Baylies, Sproat and George A. Crocker, *three of the defendants in this cause;* that, on the 7th of March, 1837, the members of the firm of Horatio Leonard and company were incorporated as the Taunton Iron Company, which was duly organized on the 27th of December, 1837; that, on the 2d of January, 1838, the Taunton Iron Company purchased of the assignees of Horatio Leonard and company all the assets of that firm, and, at the same time, entered into a contract with the assignees to pay all their debts, which contract had been performed, and the debts paid accordingly.   The whole number of shares in the Taunton Iron Company was three hundred, two hundred of which were the property of Crocker and Richmond.

The master, in his report, distributed the several claims offered for proof by the assignees of the Taunton Iron Company into five classes.

1. The first class consisted of payments made by the Taunton Iron Company, subsequent to the 12th of April, 1837, of negotiable securities originally signed by Crocker and Richmond, and indorsed by Horatio Leonard and company, or *vice versa;* which indorsements or signatures were made by Horatio Leonard and company on account of Crocker and Richmond, and for their benefit; and the original securities represented claims which would have been provable against the fund.

It appeared, that, in various instances, the notes and acceptances of the Taunton Iron Company were used, in the manner and under the circumstances mentioned in relation to the next class of claims, to take up the securities thus indorsed by Horatio Leonard and company; that the amounts of such securities, when ultimately paid by the Taunton Iron Company, were entered to the credit thereof, and to the debit of Crocker and Richmond, in the books of the parties, respectively; that, in several instances, the original securities thus taken up were produced by the assignees of the Taunton Iron Company, from the files of Crocker and Richmond; that, in one or more cases, the notes and acceptances of the Taunton

Iron Company, which had been used to take up the original securities indorsed by Horatio Leonard and company, had since been paid by the assignees of the Taunton Iron Company; and that, in making such payments, a compromise had been claimed and submitted to by the holders, on the ground of a doubt, whether the notes and acceptances of the Taunton Iron Company, thus used, were binding on that corporation.

Upon all the facts, relating to this class of claims, the master was of opinion, that Horatio Leonard and company were originally sureties of Crocker and Richmond; that the Taunton Iron Company, having taken up the securities so indorsed by Horatio Leonard and company, was entitled to be substituted or subrogated to all the rights of the holders of such securities; and, as the holders thereof would have had a right to prove the same as claims against the fund, that this class of claims ought to be allowed.

2. The second class of claims embraced certain payments, made from the funds of the Taunton Iron Company, to discharge debts due from Crocker and Richmond of a date anterior to April 12th, 1837, and in reference to which the Taunton Iron Company claimed a right of substitution.

The material facts, respecting this class of claims, were, that Crocker, of the firm of Crocker and Richmond, was president of the Taunton Iron Company, and, as such, authorized to sign and indorse the paper of the company at his discretion, and that he also had the general management and control of all the affairs of the company; that Robinson, the treasurer of the Taunton Iron Company, was accustomed to sign the company's notes, and leave them at the counting room of Crocker and Richmond, and these notes were frequently applied to pay the debts of Crocker and Richmond; that, in such cases, the notes so used were not always credited to the Taunton Iron Company, but, in general, a memorandum was made in the bill book of Crocker and Richmond, that the notes given were the Taunton Iron Company's, and that Crocker and Richmond must provide for them; that the same person acted as book-keeper to both Crocker and Rich-

mond, and the Taunton Iron Company, so far as related to that part of the business of the latter, which was transacted at the counting room of the former, and it was only by his evidence, and that of the books of Crocker and Richmond, that the several appropriations in question could be traced; that, upon the books of the Taunton Iron Company, these appropriations were merely debited as charges to Crocker and Richmond, without reference to the appropriation of the several items; that when the notes of the Taunton Iron Company were appropriated in this manner, the fact was generally made known to the treasurer, either at the time, or afterwards; and that such appropriations were made with perfectly good intentions, the firm of Crocker and Richmond being supposed to be solvent. These appropriations were made prior to the early part of the year 1841.

The creditors of Crocker and Richmond, whose debts were thus alleged to have been paid by an application of the funds of the Taunton Iron Company, were creditors before the 12th of April, 1837, and their claims were consequently provable against the fund.

On the part of the plaintiffs, it was urged, that these transactions constituted a mere loan of money from the Taunton Iron Company to Crocker and Richmond, which created a new debt; that they so appeared on the books of the company; that it would be unjust to revive old debts which had been extinguished by payment; and that the Taunton Iron Company, in reference to these claims, could only stand on the footing of a general creditor.

On the other hand, it was contended, that Crocker and Richmond had used the funds of the Taunton Iron Company, without authority, to pay their own debts, and that in equity they became holders of the paper thus taken up and discharged, in trust, for the Taunton Iron Company, whose funds had been so applied, and that the company had a right to be substituted in the place of the original holders.

The master adopted the latter as the most equitable view, and admitted this class of claims.

**3.** The third class consisted of a single item of claim, amounting to $70,879·14.

This was the first item on the debit side of the Taunton Iron Company's account, filed before the master; on which it was entered as a " balance of account," under date of April 15th, 1837. The amount was actually due from Crocker and Richmond to Horatio Leonard and company, on the 12th of April, 1837, but the balance was not struck until three days afterwards.

It was contended, before the master, that the assignees of Horatio Leonard and company were trustees of the creditors of that firm, and sold their assets on the account and for the benefit of the creditors; that the Taunton Iron Company could have no other claim than that of their assignors, and, consequently, that the claim in question was virtually a claim on behalf of the creditors of Horatio Leonard and company, and must be postponed to the claims of the creditors of Crocker and Richmond.

It was further contended, that the Taunton Iron Company had charged this item in account, and that Crocker and Richmond had assented to it, as a debt due to the company from them; and that it consequently became a new debt to the Taunton Iron Company, at the time of the assignment in January, 1838, and that the original debt to Horatio Leonard and company was thereby discharged.

In proof of this, four several accounts transcribed from the books of the Taunton Iron Company were introduced, showing the transactions between the Taunton Iron Company and Crocker and Richmond, from the 30th of April, 1838, to the 30th of April, 1841, in which this item was the first item of debit; and it was contended, that the first item of credit should be applied in discharge of it.

On the other hand, it appeared, that there was no transfer of this item of charge from the books of Horatio Leonard and company to those of the Taunton Iron Company, but that the books of the former were used by the latter, who had no other books; that this charge was upon these books

29*

at the time of the transfer, and, in copying the entries, this item was included; and that the same person acted as book-keeper to Horatio Leonard and company and to the Taunton Iron Company.

It also appeared, that nearly a year after the account between the parties, which was relied upon, had been running, namely, on the 22d of March, 1839, the Taunton Iron Company became a party to the deed then made by Crocker and Richmond for the benefit of their creditors; and there was no evidence, that the Taunton Iron Company had any other claim of a date prior to the 12th of April, 1837, or that there was any other ground than the item in question for its becoming a party to that instrument. The Taunton Iron Company was also one of the creditors, to whom Crocker and Richmond addressed a circular letter, preliminary to the deed of March 22d, 1839.

Upon the facts and evidence above stated, the master admitted this claim.

It was further contended, before the master, on behalf of the plaintiffs, that the Taunton Iron Company had received more than one third of the amount of this item, from the property held in trust, under the deed of March 22d, 1839. The ground, upon which this claim was put, was, that a dividend of two hundred dollars on a share, on two hundred shares of the capital stock of the Taunton Iron Company, amounting to $40,000, had been credited under date of March 19th, 1844, in the account of the Taunton Iron Company with Crocker and Richmond, rendered on the 30th of April, 1840, and that this dividend, being derived from the property constituting the trust fund, must be regarded as a payment out of the same, and could not be considered as a general credit.

It appeared, that sixty of these two hundred shares had been released by the trustees to Crocker and Richmond, previous to March 19th, 1840, the date of the credit, in order to enable them to pay their first year's notes, which came due on the 1st of July, 1838. The master was of opinion, that it was to be presumed, that these shares had been released in

virtue of the condition in the trust deed of March 22d, 1839, in consideration of the payment, by Crocker and Richmond, of so much of their debts, as was equivalent in amount to the value of these shares; and, consequently, that so far as these shares were concerned, there was no payment to the Taunton Iron Company out of the trust fund.

As to the dividend on the remaining one hundred and forty shares, the master was of opinion, that the trust deed was to be treated as an equitable mortgage; that the rents and profits of the property thereby conveyed remained subject to the control of the mortgagors, Crocker and Richmond; and, consequently, that the crediting of this dividend was a payment by them on account, and not a payment by the trustees, or out of the trust fund.

4. The fourth class comprised a single charge of $8500, of which the Taunton Iron Company claimed payment in full, as a preferred debt. The facts relating to this claim were substantially as follows:

On the 2d of November, 1837, Crocker and Richmond were indebted to Otis and Mason of New York, in the sum of $8500, on two acceptances, for which eighty-four shares in the stock of the Taunton Manufacturing Company were pledged as collateral security; and, at the same time, Willett and company of New York had in their hands a considerable amount of funds belonging to Horatio Leonard and company.

At this time, Sproat, one of the assignees of Horatio Leonard and company, and also of Crocker and Richmond, being in New York with Richmond, the latter, with the knowledge and consent of Sproat, took the funds in the hands of Willett and company and applied them to the payment of the debt to Otis and Mason.

At the same time, other drafts of equal amount, namely, $8500, were drawn by the assignees of Crocker and Richmond upon Otis and Mason, and were accepted by them; they continuing as before to hold the stock of the Taunton Manufacturing Company as collateral security for their acceptances.

It was stated in evidence, by Sproat, that these drafts were discounted, and the proceeds applied, for the benefit of the estate of Crocker and Richmond, in the hands of their assignees, though he was unable to state the particular application. It further appeared, that when the acceptances became due, they were paid by Willard and West, and the shares above mentioned were then transferred to them, as collateral security, by Otis and Mason. This stock was subsequently sold by the surviving partner of Willard and West, in 1842, for about four thousand dollars.

The day after the transactions above mentioned at New York, entries thereof were made in the books of the assignees of Crocker and Richmond, and of Horatio Leonard and company, as of a debt from the former to the latter.

The object of Sproat, as testified to by him, in thus applying the funds of Horatio Leonard and company, was to prevent a threatened sale of the stock held as collateral security by Otis and Mason ; which was considered to be valuable and worth much more than it was pledged for, and which would have been sacrificed if it had then been sold. This stock, in the circular letter of Crocker and Richmond, to their creditors, preliminary to the arrangement of March, 1839, was valued at $ 58,906·25; and in the schedule of property conveyed by the trust deed, it was described as eighty-four shares in the stock of the Taunton Manufacturing Company, "now in the hands and possession of George L. Willard, surviving partner of the late Willard·and West, to be transferred to the said trustees, on the adjustment of claims between us, the said Crocker and Richmond, and the late firm of Willard and West."

The master rejected the claim, both as a preferred debt, and as a debt entitled to a dividend.

5. The fifth and last class of claims comprised notes of Crocker and Richmond, indorsed by the Taunton Iron Company, given in payment of debts due prior to April 12th, 1837. which the assignees of the Taunton Iron Company had paid, and which they then held and produced before the master as vouchers.

These claims were admitted.

Among the claims, proved before the master by the assignees of the Taunton Iron Company, there were several of which no part had been paid since the 12th of April, 1837; and, in reference to these claims, it was contended by the claimants, that, to the extent of one third part of each of these claims, they were entitled to a preference, in the distribution of the assets, over those creditors, one third part of whose claims had been paid since April 12th, 1837. The master disallowed this claim.

William Rotch, Jr., presented a claim, founded on a note of hand, dated July 10th, 1834, and signed by Crocker and Richmond, in their individual names, by which they jointly and severally promised to pay him or his order nine thousand dollars. This note had been renewed by the promisors, by a memorandum thereon in writing, signed by them individually, bearing date the 22d of January, 1840. Payments of principal and interest were indorsed on the same, under dates of July 4th, 1835, July 9th, 1836, and January 10th, 1840; and the claim having been proved against the individual estate of Crocker, on the 31st of December, 1841, a dividend of twenty per cent had been received thereon.

The note was offered to be proved for the balance against the fund in court; and there was evidence before the master, that it was given for a consideration which accrued to the firm, and that it was intended to be, and was in fact, the note of the firm.

It appeared, from the indorsements, that no part of the debt had been paid or satisfied since the 12th of April, 1837; and the claimant thereupon contended. that, as to one third part, he was entitled to a preference over such of the other creditors, as had received one third part of their claims, since that time, in virtue of the arrangement of March 22d, 1839.

The master allowed the claim as a general one, but rejected the demand of priority.

The master was directed by the decretal order, among other things, to inquire and report what had become of the property

conveyed to the trustees, by the deed of March 22d, 1839; — whether the trustees had faithfully performed their duty as such ; — and what compensation should be allowed them for their services and disbursements.

The proceedings of the trustees, as appearing from their answer to the bill, and the documents appended thereto, are thus stated in substance by the master.

By virtue of the arrangement between Crocker and Richmond and their creditors, which was completed by the conveyance of March 22d, 1839, and the receipt or certificate of the same date, already referred to (see page 332), their whole property was divided into two parts. One of these parts, consisting of personal property, of the estimated value of $300,000, and upwards, was left in the hands of Crocker and Richmond, as a fund or capital to enable them to continue their business. The remainder of the partnership property, including real estate, stocks, patent rights, &c., of the estimated value of $600,000, and upwards, was put into the hands of the trustees, Baylies, Sproat and Crandell, in trust, to secure the payment of such persons as were creditors of Crocker and Richmond, previous to April 12th, 1837, with a condition, which has already been stated at length (see page 332), that the conveyance to the trustees should become void, if the debts of Crocker and Richmond should be paid according to the agreement made by them with their creditors.

In pursuance of the arrangement alluded to, a large proportion of the creditors of Crocker and Richmond, who were such on the 12th of April, 1837, and whose debts exceeded $500, in amount, gave up their original evidences of debt, and, in place thereof, received Crocker and Richmond's notes for the amounts severally due them, payable by equal portions in one, two and three years from the 1st of July, 1838. It was a part of the arrangement, that those of the creditors, whose debts did not exceed $500, should receive Crocker and Richmond's notes therefor, payable in three, six and nine months. No such notes, however, were in fact given; but, in some cases, debts of that description were paid by an

arrangement between Crocker and Richmond and the creditors, and many of them remained unpaid.

The first year's notes, given by Crocker and Richmond, as above mentioned, became due on the 1st of July, 1839, and were paid in part, as already stated (page 333), by Crocker and Richmond, out of the proceeds of trust property released to them by the trustees for that purpose.

In the course of a month or six weeks after the payment of the first instalment notes, the book-keeper of Crocker and Richmond, with their knowledge and approbation, selected from their files thirty-two of the notes, which had thus been paid, and delivered them to the trustees, by whom they were produced before the master as vouchers for the property released by them. The amount of these notes corresponded very nearly with the estimated value of the property released. In making the selection, it was not attempted to pick out the particular notes, which had been paid by the property released, but only to take an equal amount.

Among the notes thus produced by the assignees, as representing the property released, were two, which the Taunton Iron Company alleged to have been paid, in part, from their funds, and on account of which they claimed against the fund in court. These claims of the Taunton Iron Company were included in the second class already considered.

There were several creditors of the date of April 12th, 1837, who, for some unexplained reason, had not changed their original securities for new notes payable in one, two and three years, but proved them before the master. In general, creditors of this description did not receive one third of their claims in July, 1839; some had not been paid at all; and others had received small sums or proportions of their claims. No general rule was adopted in regard to the payment of these creditors; there was no apprehension among them, that they should not eventually be paid; some of them had partial security for their debts; and there was a very general expectation, that Crocker and Richmond would work through their difficulties. It did not appear, that Crocker and Richmond

were pressed for payment, or that the trustees were called upon, in any case, to make payment of claims not paid by Crocker and Richmond, or that any complaint was made to them of such non-payment, or that they were called upon by any of the creditors of Crocker and Richmond to take possession and dispose of the trust property, in consequence of the non-payment of any claim by Crocker and Richmond.

All the creditors, who did not receive one third of their debts in July, 1839, claimed before the master to have priority to that extent in the distribution of the fund in court; but this claim was rejected by the master.

From the payment of the first year's notes, in July, 1839, nothing transpired in the history of the trust until the 1st of May, 1840. On that day, Crocker and Richmond, feeling that they should not be able to meet their second year's notes which would become due on the 1st of July following, addressed a printed circular to all their creditors, containing, 1st, a request of further time for reasons stated; 2d, a statement of the trustees, that a sale of the property could not then be made without loss; and, 3d, an answer for the signatures of such of the creditors as should assent to the request. Twenty-three of the creditors signified their assent; nine declined without some further condition; and the residue made no answer. The second year's notes, due July 1st, 1840, were not paid when due, or at any time afterwards.

Before the third year's notes became due, Crocker and Richmond made an attempt to procure a further extension, which resulted in a proposition made by a committee of the creditors, to extend the time of payment for another year, on certain conditions, one of which was, that all the creditors, who were parties to the trust deed, should become parties to this arrangement. An instrument was prepared accordingly, and executed by many of the creditors, but not by all.

In December, 1841, the property of Crocker and Richmond was taken possession of by virtue of a warrant, under the insolvent laws, and was subsequently conveyed to two of the defendants in this suit, Charles J. Holmes, and Lovett Morse, who were duly chosen assignees.

The trustees were directed, by a vote of the creditors, tc take possession of the property in July, 1842; and, from that time, to the time of the rendering of their account, they charged themselves with the proceeds, rent, and income thereof.

Upon the facts above stated, the proceedings of the trustees were called in question, and various particulars of their account objected to, on behalf of the plaintiffs.

It was contended, that the trustees, by the terms of the conveyance to them of March 22d, 1839, and of their receipt or certificate of the same date, were bound to take possession of every article of the property enumerated in the conveyance, and to account therefor, and that they were estopped to say that they had not received the same, or that no evidence of the title or ownership thereof had come into their hands.

It was also contended, that, from the facts as above stated, it appeared, that Crocker and Richmond did not pay the whole amount of the first year's notes, which became due in July, 1839; that it thereupon became the duty of the trustees to sell the whole property, and to apply the same to the payment of the debts of Crocker and Richmond; and that in default thereof they were bound to account for the same at its fair market value on the 1st of July, 1839.

It was urged, on the other hand, for the trustees, that they had not been guilty of any neglect or omission of duty; that they had never been called upon to reduce into possession the property conveyed to them by the deed of March 22d, 1839; that the paper of the same date, signed by them, was merely a certificate and not a receipt, still less an estoppel; that the condition, on which they were to take the property into their hands, and dispose of the same, was not broken in July, 1839, nor until July, 1842; and that they were not to be held liable for any depreciation of the property which occurred between those dates.

The trustees, in their account, claimed to be exonerated from all liability for certain articles of property, five in number, (as to two of which no question was made in this

court,) included in the conveyance and certificate of March 22d, 1839, on the ground, that the same were not delivered to them at the time, and that no evidence of the title or ownership thereof had ever been placed in or come to their hands. The plaintiffs objected to the allowance of the account in reference to these particulars.

1. The first item consisted of eighty-four shares in the capital stock of the Taunton Manufacturing Company, which, at the time of the conveyance, were in the hands of George L. Willard, surviving partner of Willard and West, as collateral security for a debt of $8500, and which were to be transferred to the trustees, on the settlement of the account between Crocker and Richmond and Willard and West. The debt, for which these shares were held, was never paid, and they were sold in 1842 for less than half the amount for which they were pledged.

It was in evidence before the master, from a witness who kept the books of the Taunton Manufacturing Company, from 1836 to the failure of the company in 1843, that, although the stock was considered as valuable by Crocker and Richmond, yet, in his opinion, there never was a time subsequent to the 22d of March, 1839, when these shares would have sold for $8500.

The master reported, that the trustees were not responsible for these shares.

2. The second item consisted of two hundred shares in the capital stock of the Cohannet Bank, which were conveyed by the deed of March 22d, 1839, as "always subject to the payment of $10,000, to the said bank," and described in the certificate of the same date, as subject to "a lien which the bank has of $10,000 included by said company as one of their debts."

In reference to this stock, it appeared, that, on the 5th of April, 1837, Crocker and Richmond, then being the owners of two hundred shares, and, at the same time, indebted to the bank in the sum of $10,000, transferred the shares to Milton Barney, to be held by him as collateral security to

the bank, for the payment of the debt. Crocker and Rich
mond were also indebted to the bank in a further sum of
$2300, for over drafts.

At the time of the conveyance, therefore, to the trustees,
there was no stock of the bank standing in the names of
Crocker and Richmond; but, on the next day afterwards,
March 23d, 1839, Barney transferred the shares standing in
his name to the bank itself, which continued to hold them as
collateral security for the debt of $10,000; and the bank
afterwards allowed Crocker and Richmond to have the entire
control over the stock, to receive the dividends payable there-
on, (which they did for the years 1837, 1838, and 1839,) and
to direct all subsequent transfers thereof, subject to the lien
of the bank, as fully as if the stock had stood in their own
names.

The trustees did not interfere, in any manner, to prevent
Crocker and Richmond from dealing with these shares as
their own; nor did they ever take any measures to reduce
the stock into their own possession; and one of them stated
in evidence before the master, that, in his opinion, the trustees
could enforce no claim against the stock, because it did not
stand in the names of Crocker and Richmond.

These two hundred shares were subsequently transferred
by the bank, agreeably to the directions of Crocker and
Richmond, and the proceeds were appropriated to pay
Crocker and Richmond's debt to the bank, — towards pay-
ment of a debt due from them previous to the 12th of
April, 1837, — and to the raising of funds for their use.

It was contended, on these facts, that the trustees were
responsible for the par value of the stock, deducting the
amount for which it was pledged to the bank; but the
master decided otherwise, and reported that the trustees
were not responsible therefor.

3. The third item, from which the trustees claimed to be
exonerated, was the interest of Crocker and Richmond in
twenty-four shares of the stock of the Weymouth Iron Com-
pany, which was specified in the agreement of the creditors

contained in the instrument of July 1st, 1838, and in the receipt or certificate of the trustees, dated March 22d, 1839, but not included in the trust deed of that date. In the certificate, it is recited, that the twenty-four shares of the Weymouth Iron Company were to be placed in the hands of the trustees, when the certificates thereof should be issued by the company.

In regard to this interest, it appeared, that, before the execution of the conveyance in trust, Crocker and Richmond had subscribed for twenty-four shares in the stock of the Weymouth Iron Company (incorporated March 4th, 1837), and had paid $3600 towards their subscription. The certificates of stock had not been issued when the trust deed was made, and Crocker and Richmond, not wishing to pay any further subscriptions, sold their interest as subscribers to the Taunton Iron Company, who paid the remaining assessments, and credited Crocker and Richmond with the $3600 previously paid by them. The company was successful, and the Taunton Iron Company subsequently sold its interest therein at a small advance.

The master was of opinion, and so reported, that the trustees were not responsible for this item.

The trustees also claimed an allowance for certain articles of property, included in the conveyance to them, which remained unsold, and which they considered to be of no value.

The property of this description, in reference to which a question was made, consisted of one hundred and twenty shares in the stock of the Bristol Print Works, and one hundred and forty shares in the stock of the Taunton Iron Company, which, the plaintiffs contended, it was the duty of the trustees to have sold in July, 1839, and that having failed to do so, they had been guilty of neglect, and were accordingly bound to account for the property at its fair market value, at that time.

The trustees, on the contrary, contended that it was not their duty to sell this property in July, 1839, and that

inasmuch as the shares had since become of no value, without any fault of theirs, they should not be held to account therefor.

The facts, relating to the allowance claimed by the trustees, on account of these stocks, were as follows:

In regard to the shares in the Bristol Print Works, it was in evidence before the master, that they began to depreciate in value from the latter part of the year 1838; that they could not have been sold at all in the year 1839, or at any subsequent period; and that in point of fact the company was insolvent in 1839. The business was afterwards continued by the company, in the hope of retrieving its affairs, but without success; and, in 1841, it had lost its whole capital and was so heavily involved, that an assessment became necessary upon the shareholders, in order to meet the liabilities of the company.

The one hundred and forty shares in the Taunton Iron Company, for which the trustees claimed an allowance, were a part of the two hundred included in the trust deed, the remaining sixty having been released or conveyed by the trustees, as already stated, to Crocker and Richmond, in orde to enable them to meet their first year's notes, in July, 1839 In October, 1842, the Taunton Iron Company became insolvent, and assigned all its property for the benefit of its creditors. The private property of the stockholders had become liable for the debts of the corporation, in consequence of a neglect to comply with the requisitions of the law relating to manufacturing corporations, and there had consequently been no sales of stock for some years before the failure. For these reasons, the stock had no market value, and could not have been sold to any advantage.

The master reported, that the trustees were not liable to account further for these shares.

The plaintiffs objected to the allowance of the first item of payments and expenses charged in the account of the trustees. This charge was as follows:

" 1839. First instalment notes of Crocker and Richmond,
30*

taken up by sale of Taunton Railroad and Taunton Iron Company's stock:

| | | |
|---|---|---|
| " Amount [of notes] enumerated, . . . | $67,642·20 |
| " Less paid by Crocker and Richmond, . . . . | 28·20 |
| | $67,614 " |

This sum corresponded exactly with the amount of the first two items of the sales of the trust estate:

| | |
|---|---|
| "81 shares stock in Taunton Branch Railroad Corp., | $7,614 |
| "60 shares stock in Taunton Iron Co., . . . . | 60,000 |
| | $67,614" |

The notes, enumerated and charged as above, were offered before the master as vouchers for the proceeds of the first two items of sales.

The plaintiffs objected to this portion of the trustees' account and contended upon the facts previously stated with reference thereto, that the trustees had no right to release or convey the two items of property above mentioned, but that they should be held responsible therefor, and that the notes produced by the trustees were not in any sense legal vouchers or evidences of payment, to discharge the trustees.

The master was of opinion, that these notes were proper vouchers to discharge the trustees from the sales above mentioned, (without reference to the claims of the Taunton Iron Company, on account of two of them, and whether those claims were allowed or not,) and reported accordingly that the trustees should not be held further responsible for the same.

The plaintiffs objected to the items of $2182·24 and $3670·30, paid to Baylies and Sproat, two of the defendants, respectively, as assignees of Crocker and Richmond, under the indenture of April 12th, 1837, on the ground, that their services as such assignees were a proper subject of charge against Crocker and Richmond only, and not against the trust fund; that these charges were not a claim provided for by the decretal order; and that if they were a lien on the

estate conveyed to the assignees by the indenture of April 12th, 1837, the lien was waived by the release of the property to Crocker and Richmond, in pursuance of the arrangement which was completed by the execution of the trust deed on the 22d of March, 1839.

The trustees contended that their claim for services, under the indenture of April 12th, 1837, was paramount to all others; that by the terms of that instrument, the assignees were to be first paid for their services, before any disposition could be made of the proceeds of the estate thereby assigned; and that the estate had never been discharged from the lien.

The master was of opinion, and reported accordingly, that these charges ought not to be allowed, and that the trustees were bound to account for the sums retained by them on account thereof.

The trustees charged for their services, under the trust deed, the sum of $ 4362·28, being a commission of five per cent on $ 87,215·71, the amount of sales of property made by them, on their own authority, and the further sum of $ 2076·52, being a commission of five per cent on $ 41,530·57, the amount of sales of property made by them under the order of this court.

The plaintiffs objected to these charges as being too large.

The master reported, that, at the hearing, no particular evidence was given as to the extent, nature, or difficulty of the duties performed by the trustees; but, it was urged, that, upon the admitted facts in the case, they had entitled themselves to a liberal compensation; that the amount of property was large, — that their position was one of peculiar delicacy, — that they had employed eight years in the discharge of their duties as trustees, — and that in the course thereof they had been involved in two suits at law and one in equity.

The master, being of opinion that the commissions charged were not an unreasonable compensation for the services rendered, allowed the charges in question.

The cause was argued, upon the facts and with reference to the questions above presented, as well as others upon which

the court did not find it necessary to express any opinion, by *R. Fletcher & W. R. P. Washburn*, for the plaintiffs; by *S. Bartlett*, for the assignees of the Taunton Iron Company and William Rotch, Jr.; and by *T. G. Coffin*, for the trustees.

SHAW, C. J. In this case, a decretal order was entered at a previous term, by the consent of parties, by which the cause was referred to George S. Hillard, Esquire, one of the masters in chancery for this county. The report of the master having been made and filed, exceptions have been taken to it by various parties, as hereinafter stated, and arguments of counsel heard thereon.

Among other things, the effect and operation of the decretal order was, to adjudge and decree that the indenture of the 12th of April, 1837, had become inoperative and no longer in force; that the trust deed of the 22d of March, 1839, from Crocker and Richmond to Baylies, Sproat and Crandell, was valid and sufficient to transfer the real and personal property therein described; and that the surviving trustees, Baylies and Sproat, were bound to account, in this suit, for the property and the proceeds thereof, to those creditors of Crocker and Richmond, who were so by reason or on account of debts and claims, which were in existence on the 12th of April, 1837, the time of the making of the first described indenture.

The master was also directed to ascertain and report, among other things, what amount was due the plaintiffs in this suit from Crocker and Richmond, on account of any claim or claims, which existed on the 12th of April, 1837, and to order notice to be given to all other persons, creditors as aforesaid, having similar debts and claims, to come in and prove the same, or be forever excluded from the benefit of the decree.

The master was thereby further directed to report the names of all such creditors, and the amounts due to each of them, on account of claims existing on the 12th of April, 1837, although the evidence thereof might have been changed since that day.

We will first proceed to consider the exceptions, taken by the general creditors to the master's report, allowing sundry claims of the assignees of the Taunton Iron Company, as debts legally and equitably existing against Crocker and Richmond on the 12th of April, 1837, the evidence of which has been changed; by reason of which, as the claimants allege, these claims are within the intent and meaning of the decretal order. That they were not debts due to the Taunton Iron Company, at the time named, is very clear, because that corporation did not come into existence until long afterwards.

The relation of this corporation to Crocker and Richmond was very peculiar. It appears, that prior to April, 1837, there were two commercial houses established in Taunton, one under the firm of Crocker and Richmond, consisting of Samuel Crocker and Charles Richmond; and the other under the firm of Horatio Leonard and company, consisting of Crocker and Richmond, Horatio Leonard, George Leonard, Charles Robinson, J. Robinson, and E. Robinson.

By an act of incorporation passed March 7th, 1837, the same individuals, composing the firm of Horatio Leonard and company, were incorporated by the name of the Taunton Iron Company; but this corporation was not organized until the ensuing December, which was long after the failure of both houses, and after the trust deed executed by Crocker and Richmond on the 12th of April, 1837.

The firm of Horatio Leonard and company failed at the same time with Crocker and Richmond, and assigned their property to the same trustees, Baylies, Sproat and George A. Crocker, for the benefit of their creditors.

The Taunton Iron Company was organized on the 27th of December, 1837, and, on the 2d of January, 1838, purchased of the assignees of Horatio Leonard and company all the assets of that firm, and received a conveyance thereof from the assignees; the corporation undertaking, at the same time, to pay and discharge all the debts and obligations of Horatio Leonard and company.

The grounds upon which the Taunton Iron Company, coming into existence long after the 12th of April, 1837, claims as a creditor holding debts due on that day, are, that, having purchased all the assets, and undertaken to pay all the debts, of Horatio Leonard and company, the corporation became, in equity, their successor, and stood in their place, and took their rights; that the debts in question were debts due from Crocker and Richmond to Horatio Leonard and company; that the assignment of the assets of Horatio Leonard and company transferred to the Taunton Iron Company, in equity, the debts due from Crocker and Richmond; that these debts existed on the 12th of April, 1837, and carried with them the benefit of the trust fund, created for the security of all the debts of Crocker and Richmond, which were due at that time; also, that, at that time, Horatio Leonard and company stood in the relation of indorsers and sureties, on a large amount of the debts due from Crocker and Richmond; that, by force of the obligation of the corporation to pay all the debts of Horatio Leonard and company, it was bound to pay and take up the notes on which Horatio Leonard and company stood as indorsers and sureties for Crocker and Richmond; and, that, having so paid them, the corporation is entitled to stand in the place of the creditors whose debts were thus paid, and to have the benefit of the trust fund created for the security and payment of those debts by Crocker and Richmond, who stood in the character of principal debtors; also, that Crocker and Richmond, after the 12th of December, 1837, and after the organization of the Taunton Iron Company, made use of the funds of the latter to pay debts due prior to the 12th of April, 1837; and that in equity the corporation has a right to look, not only to Crocker and Richmond, but to the fund provided for the payment of the debts thus discharged.

The master, by his report, has divided these claims of the Taunton Iron Company into five classes; and has reported the facts respecting each class, together with his decision thereupon.

I. The report states, that the first class comprises payments made by the Taunton Iron Company of negotiable paper originally signed by Crocker and Richmond, and indorsed by Horatio Leonard and company, or *vice versa.* The report is not so full, precise and intelligible, with respect to this class, as could have been desired; and we are not certain, after the closest examination, that we understand the facts, as they were understood by the master. In the description given by the master of these claims, notes indorsed by Horatio Leonard and company, and notes signed by Horatio Leonard and company, and indorsed by Crocker and Richmond, are put on the same footing. In regard to the latter, that is, notes signed by Horatio Leonard and company, the legal presumption is, that Horatio Leonard and company were the principal debtors, and Crocker and Richmond the sureties; if so, the amount due on such notes was the proper debt of Horatio Leonard and company, and the Taunton Iron Company, by its obligation, was bound to pay the same out of the assets assigned, and would have no remedy even against Crocker and Richmond, and, of course, no claim on the trust fund. But the report afterwards goes on to say, "that these indorsements *or signatures* were made by Horatio Leonard and company on account of Crocker and Richmond, and for their benefit;" from which we conclude, that the master had satisfactory proof before him, that, although the names of Horatio Leonard and company appeared as promisors or makers on these notes, yet, in point of fact, this was matter of form only, and the notes were really issued for the proper debts of Crocker and Richmond, and for their accommodation; and that if Horatio Leonard and company took them up, they did so, in effect, as sureties, and that Crocker and Richmond thereby became liable for the amount.

We also understand, by the report, that these specific notes, on which, on the 12th of April, 1837, Crocker and Richmond were principal debtors, and Horatio Leonard and company were sureties, remained unpaid, until after the Taunton Iron Company came into operation, and were then paid and taken

up by that company, under its obligation to pay the debts of Horatio Leonard and company.

If these notes and acceptances were in fact renewals of debts existing on the 12th of April, 1837, that is, if, after the Taunton Iron Company came into operation, notes outstanding in April, 1837, were taken up by Crocker and Richmond, by giving their own notes, with the signature or indorsement of the Taunton Iron Company, instead of the preëxisting indorsement or suretyship of Horatio Leonard and company, although these notes were afterwards paid by the Taunton Iron Company, such payment would be a new credit given by the Taunton Iron Company to Crocker and Richmond, originating after the 12th of April, 1837, and could not be considered as made in virtue of their undertaking to pay the debts of Horatio Leonard and company, but as a payment of a ʻdebt newly created in virtue of a new loan of their credit to Crocker and Richmond, and thus would not be a debt coming under this class of claims.

Supposing the class of claims thus allowed by the master to consist of notes constituting the proper debt of Crocker and Richmond, on which Horatio Leonard and company were indorsers or sureties ; and supposing these notes to be subsisting on the 12th of April, 1837, and continuing specifically until paid and taken up by the Taunton Iron Company and then paid and taken up by the latter; the court are of opinion, that the decision of the master allowing them as claims existing April 12th, 1837, of which the evidence or form had changed, was right, and that the exceptions to that part of the master's report allowing them must be overruled.

This conclusion rests on the assumption, that the Taunton Iron Company, as the assignee of the assets of Horatio Leonard and company, and as having undertaken to pay their debts, may now come in and prove on the footing of creditors, to whom debts were actually due on the 12th of April, 1837. On recurring to the assignment of that date from Crocker and Richmond to trustees, we find, that, in the class of their creditors amongst whom an equal distribution

of the trust property was to be made, were included those who might afterwards become their creditors, by reason of any then existing note, acceptance, indorsement, or liability; that is to say, those who were then standing in the relation of indorsers or sureties, on contracts previously made, and who might be obliged to pay the debts, for which they so stood as sureties, (although, strictly speaking, in such cases, the debt arises on the payment as surety, and not on the making of the contract, yet,) should be taken and deemed, for the purposes of that trust, to be actual creditors; and this is conformable to the provisions of the act of 1836, *c.* 238, which was then the law regulating assignments for the benefit of creditors. Under this provision of the assignment of April 12th, 1837, if Horatio Leonard and company stood in the relation of sureties or indorsers for Crocker and Richmond, they were parties to the assignment, and *cestuis que trust*, who might become creditors by payment of the debts for which they were sureties. On making such payment, they would stand upon the same footing, in reference to the trust, as if they were creditors to whom debts were actually due.

This brings us to the consideration of a very important question, in the present case, namely, whether the Taunton Iron Company, acting under the forms of a corporation, but being the successor and assignee of Horatio Leonard and company, a firm in which Crocker and Richmond were themselves partners, and, in which, when made a corporation, they held the larger part of the stock, can prove its claims under a trust, which was created for the benefit of the creditors of Crocker and Richmond, in competition with those creditors. This proof was resisted by the creditors, but allowed by the master; and, being now excepted to, presents the question for consideration.

We think it is a well settled rule of law, that, as between original parties, by the assignment of a chose in action, the assignee takes an equitable title to the demand assigned, in the same plight, in which it was held by the assignor, entitled

to the same immunities, privileges and benefits, and subject to the same charges, equities, rights of set-off, and counter claims, as in the hands of the assignor. This is the principle, upon the ground of which the Taunton Iron Company alleges, that, having by various legal and equitable conveyances become entitled to debts due from Crocker and Richmond to Horatio Leonard and company, it thereby became entitled in equity to the benefit of a trust fund, then previously created by Crocker and Richmond, for the ultimate security of those debts.

There would certainly be strong ground to sustain this claim, if these were separate and independent parties. But we are met by the objection, that the Taunton Iron Company can stand on no better ground than Horatio Leonard and company, who could not be permitted to prove as creditors. On recurring to the facts, it appears, that Horatio Leonard and company were a firm composed of Leonard and the Robinsons, together with Crocker and Richmond, who were themselves the owners of the major part of the whole interest. The argument is, that Horatio Leonard and company could not come in and prove, in competition with the creditors of Crocker and Richmond, before those creditors had been paid in full. This could not be done, it is said, by the firm of Horatio Leonard and company, because it would in effect enable Crocker and Richmond, composing a part of that firm, and being the major part in interest, to take back, in another form, a part of the funds assigned for the benefit of their creditors; nor could any claim be made by the other members of the firm, because the debt was a joint one, and could only be claimed by all jointly.

The trusts, on which the assignment of the 12th of April, 1837, was made, do not countenance the idea that any firm, in which Crocker and Richmond were partners, could share in the fund. The assignment was in trust, after other things, to distribute the residue of the assigned property to and among all the creditors of the firm of Crocker and Richmond, and of Samuel Crocker and Charles Richmond, and all who

should become their creditors, by reason of any then existing note, acceptance, indorsement, or liability for them. If Crocker and Richmond could take a part of the fund themselves, it would not be wholly in trust for their creditors. Indeed, by the statute of 1836, *c.* 238, under which this assignment was made, it would have been void, if it had not been so made as to include all the debtors' property, not exempted from attachment, for the benefit of all their creditors, and to give to all the creditors an equal distributive share of the whole property assigned. It seems, therefore, to be a just inference, that if the assignment had expressly recited, that the property was to be held in trust, amongst other' purposes, to pay a debt due to the firm of Horatio Leonard and company, a firm of which the assignors were themselves members, and so in part in trust for themselves, it would have been contrary to the spirit of the statute, and to that extent at least questionable.

Were this the case of a firm consisting of a number of persons, some of whom composed a separate minor firm, and the separate minor firm were in a process of insolvency, under a trust deed, or under legal proceedings, it would be difficult to say, that the larger firm could prove; therefore, if Horatio Leonard and company were solvent, and were claiming in their own right, it would seem, that they could not, as creditors, prove debts due from Crocker and Richmond, composing a part of the same larger firm, for the reasons stated. But there are several circumstances, which distinguish this from the common case, and take it out of the operation of the general rule.

It is a fact, worthy of some consideration, perhaps, though of itself not very decisive, that these were distinct concerns established for distinct purposes, the larger being a manufacturing establishment, carrying on the iron business, and the smaller a firm engaged in general commerce.

But further, we understand that both the Taunton Iron Company, and Crocker and Richmond, are deeply insolvent; and that in truth this is a question only between the two

classes of creditors. It was stated in argument, indeed, that it did not appear, that the Taunton Iron Company was insolvent, and perhaps it does not so appear directly; but it does appear from the evidence in another part of the case, that the shares in the stock of the Taunton Iron Company are worth nothing; from which it may be inferred, that, on payment of their debts, nothing would be left for the holders of shares. Then, as between the respective classes of creditors, we think it is not inequitable to admit this proof, so far as to distribute the assets, as if the concerns had in truth been separate.

But supposing it should turn out, that the Taunton Iron Company is not insolvent, and that upon the allowance of its claims, the distributive shares payable to Horatio Leonard and company, together with other effects, will be sufficient to pay its debts, and leave a surplus; in that event, we can perceive no objection to framing the decree in such a manner, as to direct an account to be taken between the partners, and that any distributive share of the surplus, which should be coming to Crocker and Richmond, as stockholders, should be retained and paid to their assignees, to be added to the fund distributable amongst their other creditors. If, therefore, considerations of equity would require, in the case supposed, that these parties, for the purpose of regulating the distribution of assets between the two classes of creditors, should be regarded as separate parties, this consideration would not be necessarily controlled by the objection, that, in such a distribution, Crocker and Richmond, as a part of the larger firm, might take a part of the fund, against their own creditors, and against the terms of the trust assignment.

But what distinguishes this case still more from the ordinary case supposed, and seems quite decisive, is, that the Taunton Iron Company, now claiming, is a corporation, vested by its act of incorporation with the functions of a body politic, and, as a distinct person, capable of acting and dealing and contracting with its members, as with third persons. And though this corporation originally consisted of the same persons who composed the firm of Horatio Leonard

and company, and though Crocker and Richmond were holders of two hundred out of the three hundred shares, into which the capital stock of the company was divided, yet, by the incorporation, the relation of Crocker and Richmond to the company, and their interest in its stock, became entirely distinct from the relation which subsisted between them and the firm of Horatio Leonard and company, and their interest therein, whilst they were members of that firm. They could contract with the corporation, and could maintain suits against it, both in law and in equity, and could be sued by the corporation. They might transfer their shares in whole or in part, and thus cease partially or wholly to have any interest in its funds.

But further, as we understand the case, Crocker and Richmond, by their assignment of March 22d, 1839, transferred to the trustees all their shares in the Taunton Iron Company, as then organized and in operation, so that should that company be solvent, and leave any thing for the stockholders, such surplus would be received and held by the trustees, as a part of the trust fund distributable among the creditors of Crocker and Richmond, by which justice would be done.

The fact, that the members of the larger firm became incorporated pursuant to the provisions of law, and thereby acquired a capacity to contract with their members, and to sue and be sued, distinguishes the case from the ordinary one of the larger partnership proving against the funds of the smaller, or of the smaller proving against the funds of the larger, of which they are respectively constituent parts. The incorporation avoids the difficulty, which arises in those cases, where some of the same persons, in their natural capacities, act in the conflicting relation of debtor and creditor, in the same process.

The court are therefore of opinion, that, so far as the Taunton Iron Company can establish a legal or equitable claim against the trust fund, in the hands of the trustees, according to the terms and true construction of the trust deeds of April 12th, 1837, and of March 22d, 1839, and of

31*

the decretal order heretofore made in this cause, it is no valid objection thereto, that the Taunton Iron Company is the successor and assignee of the former firm of Horatio Leonard and company, although Crocker and Richmond, the assignors, were members of that firm and of the corporation which succeeded it.

II. The second class of claims made by the Taunton Iron Company against Crocker and Richmond, as debts due prior to April 12th, 1837, comprises payments made from the funds of the Taunton Iron Company, by Crocker and Richmond, to discharge debts due from Crocker and Richmond, of a date prior to April 12th, 1837. The Taunton Iron Company claims the right of substitution.

The material facts, in regard to this class, are, that Mr. Crocker was president of the Taunton Iron Company, authorized to sign and indorse the paper of the company, at his discretion, and had the general management and control of its affairs. Indeed, it is to be recollected, that Crocker and Richmond, at the time, were owners of two thirds of the shares, into which the stock of this company was divided.

The Taunton Iron Company, by its president and treasurer, had full notice of the credit of the company being given to Crocker and Richmond; and if, in consequence of a loan of this credit, the company was called upon to pay its indorsements, such payment simply created a new debt in favor of the company against Crocker and Richmond, and gave the company no claim, legal or equitable, upon the fund set apart for the security of Crocker and Richmond's previous debts. It amounted to a payment by Crocker, and Richmond of their own proper debt; was so considered by the parties, at the time; and was entered on their respective books, as a charge by the company against Crocker and Richmond. The court are therefore of opinion, that the decision of the master, in allowing this class of claims, as a charge under the decretal order upon the trust fund, or as a demand existing on the 12th of April, 1837, was incorrect, and that the same must be reversed, and this class of claims disallowed.

III. The third class of claims, made by the Taunton Iron Company, as a debt due from Crocker and Richmond, on the 12th of April, 1837, consists of a single item amounting to $70,879·14. This is a balance of account, which was due from Crocker and Richmond to Horatio Leonard and company, at the time when both firms made their respective assignments, April 12th, 1837, and which was subsequently assigned by Horatio Leonard and company to the Taunton Iron Company. The master reports, that, although the entry on the books, in which this balance is first stated, bears date the 15th of April, 1837, yet that it was actually due, and all the transactions out of which it arose took place, before the 12th of April, 1837; and, therefore, if it can be regarded as a debt provable under this trust, it was due before and on that day.

For the reasons heretofore given, the court are of opinion, that if this debt has not been paid, liquidated, or reduced, by the subsequent transactions between the parties, it is a debt which may be proved against the fund by these claimants, in competition with the separate creditors of Crocker and Richmond.

In addition to the reasons heretofore stated, in reference to the first class of claims, we think it is to be considered, that, although the fund now sought to be distributed is a fund created by the voluntary assignment of Crocker and Richmond to the defendant trustees, on the 22d of March, 1839, and does not arise under any legal process of insolvency, yet, that the trust deed of March 22d, 1839, was a supplement to the anterior proceedings of April 12th, 1837. The deed of the former date was part of an arrangement, by which the property assigned under the indenture of April 12th, 1837, was reconveyed to the debtors, and a portion of it conveyed to the defendant trustees, to be held by them as security for the payment of the same debts, which were to have been satisfied under the former assignment, provided those debts should not, in the mean time, as was contemplated by that arrangement, be paid by Crocker and Richmond. This prin-

ciple is recognized by the decretal order, which was entered by consent of all parties, and which directed that the property last assigned in 1839 should be applied to pay debts due at the date of the first assignment. That previous assignment was made in pursuance of the statute of 1836, *c.* 238, regulating assignments by debtors to trustees, in trust for the payment of their debts. The statute required that such assignment should embrace all the debtor's property, with a slight exception; and that it should provide for an equal distribution of the same among all his creditors; and it regulated the duties of assignees and provided remedies for parties interested. Whatever the statute was in terms, in effect, it was a qualified legal proceeding in insolvency, or a modified state bankrupt law. Both firms simultaneously made similar assignments, and to the same trustees. Under these circumstances, if a settlement of the affairs of both firms had been made under their assignments, we think the assignees of either firm would have had a right to prove a balance against the assets of the other. The two firms having carried on distinct branches of business, and kept distinct accounts, debiting and crediting each other, and having severally obtained credit according to their supposed capacities, means and success, the treating of them as distinct concerns, for the purpose of a distribution of their assets among their respective creditors, would appear to afford as equitable a rule as the state of such a complicated relation would admit. Under this rule, the assignees of Horatio Leonard and company would have a right to prove the balance in question against the assets of Crocker and Richmond; subject to this limitation only, that if there should be more than enough to pay the creditors of Horatio Leonard and company, in full, so as to leave a surplus to the firm, an account should be taken, and any balance coming to Crocker and Richmond should be replaced in the hands of their assignees, to be applied, until their separate creditors should be paid in full. Under the peculiar circumstances of the present case, resulting from the several assignments and the decretal order, the proofs are to be regulated,

and the distribution under the last assignment to be made, upon the principle stated, namely, as if both firms were in bankruptcy, under distinct commissions; and, therefore, if the debt due by Crocker and Richmond, the minor firm, to Horatio Leonard and company, the larger firm, and assigned to the Taunton Iron Company, still subsists, it is provable against the fund to be distributed.

But it is contended by the other creditors, that this balance has been liquidated by the subsequent dealings and transactions between Crocker and Richmond and the Taunton Iron Company.

The ground taken is, that subsequent to April 12th, 1837, the Taunton Iron Company charged this balance in account with Crocker and Richmond, and took them as its debtors; and that, although the corporation remained the creditor of Crocker and Richmond, as before, for this balance, the balance thus became a debt which occurred after April 12th, 1837, and consequently cannot be proved under the decretal order. It appears, that four several accounts current were rendered by the Taunton Iron Company to Crocker and Richmond, the first item in the first of which is a balance of $70,919·60, which is the same or nearly the same as that due from Crocker and Richmond to Horatio Leonard and company, at the date of their respective assignments. This account was made out by the Taunton Iron Company, under date of April 15th, 1837, many months before that company was organized as a corporation. But it was brought down to May 1st, 1838, which was after the corporation was organized. These circumstances are alluded to, that they may be made the subject of more particular inquiry and consideration, if they should be found to be of any importance. The court are of opinion, that neither the charging of this balance in a new account, opened by the Taunton Iron Company with Crocker and Richmond, of a date subsequent to April 12th, 1837, nor the rendering of such an account, would necessarily deprive the company of the benefit of the assignment, if otherwise entitled to it. Such entries in books and

accounts are not held to be conclusive, and, under some circumstances, they are not of much weight, as evidence. *Barker* v. *Blake*, 11 Mass. 16; *Baring* v. *Crafts*, 9 Met. 380. But this claim does not stand upon the footing of mere entries in books or accounts; it was the commencement of an account, under which large and extensive dealings took place, for several years, between the parties; and it becomes necessary, therefore, to inquire into the character of those dealings.

It is manifest, from the proposals made by Crocker and Richmond to their creditors, in January, 1838, and the arrangement agreed upon under the same, but not completed until March 22d, 1839, that the object of Crocker and Richmond, in that arrangement, was to disengage the more active and available part of their funds, embraced in the first assignment, and to have those funds restored into their own hands, in order to enable them to engage in active commercial business, under an expectation, out of that business, to pay their debts by instalments; and also to reassign the residue of the property to the present trustees, as a security for the ultimate payment of the same debts. It is manifest, that the Taunton Iron Company, after its organization, engaged actively and extensively in the manufacturing business, and in transactions incident thereto, though it is difficult to perceive how and when that corporation acquired any capital to enable it to do so. Crocker and Richmond were stated to be the owners of two thirds of the capital stock, and their interest therein was actually estimated, in their second assignment, at $200,000; although the whole of their property was under sequestration, and in the hands of assignees, from the time of the organization of that company, to the time of such second assignment. But, by whatever means it was done, it appears that both parties went into active business, and that there were large transactions between them, which are embraced in these accounts.

It was proper for the Taunton Iron Company to carry this balance into its new account against Crocker and Richmond,

because the latter were to pay it. And if the parties went immediately or at any time afterwards into active business, in the course of which new credits were given, and new debts made, and an account stated and rendered, and the balance carried to new account, and so on, we are of opinion, that, if the aggregate of the money paid on such general account, without any specific application or appropriation thereof, exceeded the original item of debit, consisting of the balance with which the account commenced, that original balance must be considered as liquidated and absorbed in the general account, and is no longer to be regarded as a debt due April 12th, 1837.

We say payments on general account, in reference to which there was no appropriation or specific application. If it should appear, from the entries themselves, to the credit of Crocker and Richmond, that the moneys so credited were paid specifically on account of a debt which was contracted after the 12th of April, 1837, or otherwise upon any specific appropriation, these payments must be regarded as payments on account of such specific debt or appropriation ; but payments generally to them, or for their use, and charged in account, must be deemed payments on such general account. The report does not state the facts with sufficient fulness, to enable us to judge whether this first balance has been liquidated and absorbed by payments on general account ; and we think it must be again referred to the master, to make a more specific statement, with reference to this point, conformably to the principles above stated. There appears also to be a credit in this account, in March, 1840, of $40,000, as a dividend of profits. We do not see why this is not a credit to Crocker and Richmond, in general account, and thus applicable to the balance first above charged. But this is not fully stated. The whole of this account, therefore, with the item in question, must be referred to the master for the purposes suggested.

IV. The fourth class comprises a single item of $8500, which the Taunton Iron Company claimed to have paid in full, as a preferred debt, out of the trust fund.

This claim was disallowed by the master, both as a general and as a preferred debt. The only possible ground, on which it could be made, was, that the common trustee had taken money from the trust fund of one trust, and added it to the trust fund of the other trust, the latter receiving it with notice of the former trust. We are of opinion, that the facts do not bring the case within this principle. The object of Sproat, in taking funds from the trust of Leonard and company, and applying them to the trust of Crocker and Richmond, was to redeem a large amount of shares in the Taunton Manufacturing Company, belonging to the latter trust. But, in truth, these shares never were redeemed. In the first instance, they were pledged for new acceptances, which went to the then present use of Crocker and Richmond, and not to the trustees, and the shares were afterwards sold, to satisfy these drafts, and were insufficient for the purpose.

The court are of opinion, that the decision of the master, disallowing the claim of the Taunton Iron Company, to have this sum paid out of the trust fund in full, was correct, and the report in that respect is confirmed. The claim to have it allowed, as a general debt, entitling the claimants to a dividend, was waived at the hearing.

On this part of the case, it was said in argument, that the facts reported would not sustain the position, that the money raised by discounting the new acceptances of Otis and Mason went to the use of Crocker and Richmond, and not into the hands of the trustees for the benefit of their creditors. But we are inclined to that opinion from the whole evidence. Sproat testified, indeed, that the proceeds were applied to the benefit of the estate of Crocker and Richmond, in the hands of their assignees; but he could not tell how they were applied, or whether they were applied at all, to any of the purposes of that trust. On the contrary, it does not appear, that the assignees have applied those proceeds, or that they now hold them, or that at that time, namely, November 3d, 1837, the trustees had paid any of the debts of Crocker and Richmond. But the question does not depend on that fact. The

object which Sproat had in view was to get further time for the sale of the shares in the Taunton Manufacturing Company, which, in the agreement of July 1st, 1838, between Crocker and Richmond and their creditors, were estimated at $ 58,906·25. Had the object been attained, and had this sum been saved to the trust fund, there would have been more equity in the claim. But the object failed. If the money, which was derived from the discount of the new notes, was not brought into the fund for distribution amongst the creditors, then this fund has derived no benefit from the operation.

But further, this transaction took place in November, 1837 before the Taunton Iron Company was organized, and, of course, before any transfer of the assets of Horatio Leonard and company to the Taunton Iron Company by the assignees of the former. The assets in the hands of Willett and company had been then disposed of, and, of course, the claim therefor (of Horatio Leonard and company against Willett and company,) as a chose in action, did not pass by that assignment. Can it be presumed, without some special provision to that effect, that it was the intention of the then assignees of Horatio Leonard and company, to transfer to the Taunton Iron Company a claim against themselves, in another capacity, for a breach of trust, in having thus disposed of some of the assets? It appears to us, that no such intention can be presumed. Horatio Leonard and company and the Taunton Iron Company, at that time, consisted of the same persons, and notice to them in one capacity was notice to them in the other. When, therefore, this company was afterwards organized, and the assignment made by the assignees to the corporation, we think it must be considered, that the latter took the assets as they then existed, unless there was some special provision in the assignment, expressing more particularly what claims, as choses in action, were intended to pass. This view is confirmed by the fact, that the claim in question was, as we understand, charged in the accounts as a demand against Crocker and Richmond.

But further, under the decretal order, we think this was not a debt due from Crocker and Richmond, April 12th, 1837, which the master was directed to inquire into and state. If this claim be well founded, it is not for a debt; it is a claim, that a certain sum of money, belonging to the Taunton Iron Company, has, by mere accident or management, been placed in the fund created for the benefit of the creditors of Crocker and Richmond, and that the assignees of the Taunton Iron Company have a good equitable right to withdraw the same, before the fund can be distributed.

V. The fifth and last class of claims consists of notes of Crocker and Richmond, indorsed by the Taunton Iron Company, given in payment of debts due prior to April 12th, 1837, which the assignees of the Taunton Iron Company have paid and now hold and produce. These were allowed by the master.

For the reasons already given, if the Taunton Iron Company was in a condition, as the holder, to claim debts due before the 12th of April, 1837, these demands could not be claimed. The indorsements of the Taunton Iron Company for Crocker and Richmond were a new loan of credit, originating with such indorsements, after the 12th of April, 1837; and, although the money thus raised went to pay and discharge debts due from Crocker and Richmond, which originated prior to April 12th, 1837, yet such payment was still a payment or discharge and extinguishment of the former debts by Crocker and Richmond, by the use of their own means, and did not continue the former debts in force. The court are therefore of opinion, that these are not debts included under the decretal order, as debts subsisting on the 12th of April, 1837, of which the form and evidence has been changed; that they ought not to have been allowed; and that the master's decision, allowing them, must be reversed.

VI. Several important questions, arising upon the decretal order, and the report, depend on the construction of the deed of trust of the 12th of April, 1837.

It seems to have been assumed and taken for granted by

all parties, that the debts of Crocker and Richmond, as they existed on the 22d of March, 1839, and were agreed to be paid by instalments, and secured by the deed of trust of that date, were debts actually existing on the 12th of April, 1837, and that all payments, made by any person on those instalments, were in effect payments towards debts which existed on that day.

By the decretal order, the master was directed to inquire and report, whether any creditor had received, from the property held in trust under the deed of the 22d of March, 1839, or the proceeds thereof, more than one third of the amount of his demand, as the same existed on the 12th of April, 1837, (that being the proportion supposed to have been paid the creditors generally since the 12th of April, 1837;) and if so, the excess so paid, over and above one third of the claim of such creditor, was to be considered as a payment *pro tanto* of any dividend to which he might otherwise be entitled.

This direction would seem to imply, that the trust deed of the 22d of March, 1839, had been under the consideration of the court, and that it had been judicially determined, that the deed created a trust fund, specifically applicable to the payment of the instalment notes then to be given; and that all payments made on those instalment notes were made directly or indirectly out of the fund, and diminished it *pro tanto.* Hence it has been inferred, and the inference would seem to be a just one, upon the premises, that as the fund was created and appropriated to the equal benefit of all the creditors, in proportion to their debts, if any one creditor had not received the full amount of his first instalment, or one third part of his debt, he should be entitled to receive a sum out of the fund, sufficient to make his payment one third, before other creditors should receive any thing more; and so, if a creditor had received more than his one third, the excess over one third should be considered as an advance to him towards his next dividend, and deducted accordingly from that dividend.

But these inferences, and others material to the cause, depend upon the nature, purposes and operation of the deed of trust, which, as yet, has not been the subject of judicial construction. The decretal order was agreed upon by the parties, and was probably framed with a view to bring such facts before the court, as might enable them to come to a decision, according to the legal construction which might be subsequently given to the deeds, and to enable the court to ascertain and decide upon the rights of the parties.

Looking at the deed of the 22d of March, 1839, and the preliminary agreement of the creditors of July 1st, 1838, the proposals recited in the latter, the objects and purposes therein expressed, and the provisions, stipulations and conditions contained in it, the question is, whether the arrangement effected by these instruments constituted and set apart a fund, the proceeds of which should be specifically applied, by the trustees, to the payment of the notes payable in one, two and three years, then proposed to be given by Crocker and Richmond, as they should become due; or whether the trust deed, by which the arrangement was completed, was a mortgage or conditional conveyance of the real estate and property specified therein, defeasible upon the payment of the notes by Crocker and Richmond, according to the tenor thereof.

It seems to us quite clear, that the arrangement was of the latter character. The preliminary agreement recites a communication made by Crocker and Richmond to their creditors, on the 10th of January, 1838, referring to the assignment of the 12th of April, 1837, and representing the difficulty and impracticability of making sales of the property; and proposing a mode, by which they might be relieved from the incumbrance of the previous assignment, and be left in possession of an available property of about $300,000, to enable them to go on with their business; and by which property consisting of real estate and stocks estimated at $600,000 and upwards might be appropriated, as security for the ultimate payment of their debts estimated at $380,000. It then recites an agreement of many of the creditors, accord·

ing to these proposals; discharging the former assignees from all claims under the assignment of April 12th, 1837; stating the property to be conveyed to Sproat, Baylies and Crandell, in trust, to hold the same; and providing that in case Crocker and Richmond should fail to pay their several debts, in the manner proposed, the property should be sold, and the proceeds applied to that purpose, by the trustees. The trust deed, dated March 22d, 1839, completes the arrangement, and conveys to Baylies, Sproat and Crandell, and the survivors and survivor of them, the estate referred to, consisting of real estates, stocks, shares and patent rights, to be held in trust for the purposes particularly set forth in the agreement above described (which it substantially recites) between Crocker and Richmond and their creditors, made on the 1st of July, 1838. It then contains covenants against incumbrances, and the following condition : "Now, therefore, if the said Samuel Crocker and Charles Richmond shall well and truly pay to their several creditors the full and just amount of their debts, in the manner and on the days above mentioned, and otherwise faithfully comply with the terms of their said agreements above mentioned, and pay the trustees a compensation, &c.. then this deed to be void."

It seems very clear, that this was a conditional conveyance, defeasible on a condition subsequent; and that if Crocker and Richmond had paid their notes, agreeably to the terms thereof, the condition would have been saved at law, and the property would have revested in the grantors. It was therefore a mortgage, and gave the trustees no power to sell the property, until a breach of the condition, by the non-payment of the notes. It is equally clear, that the notes given by Crocker and Richmond were to be paid by them out of their own funds and means, and not by the trustees, out of the property thus mortgaged for security.

How it was expected that Crocker and Richmond, by the use and employment of about $300,000, were to pay $380,000, in three years, or how, with about one third of the fund, they were to pay debts, for the payment of which the whole fund

32*

in the hands of the former trustees had proved unavailing, it is difficult to conceive.

It is obvious, however, that Crocker and Richmond had one year, before any of the instalment notes became due, and before there could be a breach of the condition. And, further, although the deed of the 22d of March, 1839, contained no express stipulation, that, on breach of the condition, the trustees should have power to sell the property and pay the debts from the proceeds, yet, as that deed expressly referred to the agreement of the creditors of July 1st, 1838, by which they acceded to the proposals of Crocker and Richmond, the latter conveying the property in question to the trustees, in trust to hold and dispose of the same, and with the proceeds to pay the debts, in case Crocker and Richmond should fail to pay them, we suppose that the two deeds are to be construed together, and that although the trust to sell and pay the debts is not expressed in the mortgage, yet as it is expressed in the deed therein referred to, and in pursuance of which the mortgage purports to be given, the trustees have the power. Indeed, it is that power, which the trustees and mortgagees are called upon, by this suit, to execute, by distributing the proceeds of the mortgaged property in their hands among the creditors of Crocker and Richmond, after the failure of Crocker and Richmond to pay their notes, and the consequent breach of the condition of the mortgage. Although Crocker and Richmond, therefore, might hope to pay the first instalment notes, and perhaps the succeeding ones, yet the arrangement contemplated a direct and easy mode, by which the mortgaged property should be made available for that purpose through the trustees, in case Crocker and Richmond should be unable to pay the first, or after instalments of their debts.

From this view of the provisions and terms of the trust deed, it follows, that all that part of the debt of Crocker and Richmond, which was paid by the payment of their instalment notes, must be considered as paid by Crocker and Richmond out of their own funds and means, (those reserved or

otherwise, it makes no difference,) and not, either actually or constructively, out of the trust fund.   Therefore, although the debts of Crocker and Richmond are thereby released *pro tanto*, and creditors can only claim for the balance, from whatever source, or by whatever means, the debts may have been diminished, yet such a payment is not one, which, in any other way, diminishes the claim of creditors on the fund for the balance of their debts.

And, so, if a creditor has received more than one third of his debt, yet if not received from the trustees, or out of the fund, the excess over one third merely diminishes the debt *pro tanto*, and cannot be considered as a payment, in advance, out of the fund, to be deducted from the dividend of such creditor.

The amount actually due to any creditor at the present time, on a debt which existed April 12th, 1837, reduced in any mode, by the application of securities, or by payments by Crocker and Richmond, or otherwise, not being received of the trustees, is the measure of his claim on the fund.

Indeed, we are not aware that a claim is made on the part of the trustees, for having paid any of the debts of Crocker and Richmond, after condition broken, and pursuant to the trust, other than this; that they released certain of the trust property to Crocker and Richmond, to enable them to meet their first instalment notes ; but, for the reasons already alluded to, and for others to be stated hereafter, we do not consider this as a payment pursuant to the trust.

The view of the subject last taken disposes of the question of Mr. Rotch's claim.   We think he is entitled to prove for the balance of his debt; but that he has no claim to be allowed one third thereof, out of the fund, in full, before any payment to those creditors, who have received of Crocker and Richmond one third of their debts.   The master's report in this respect is affirmed in both particulars.

VII. Our attention is next called to the exceptions taken by the plaintiffs and other creditors to the accounts of the trustees ; in which the creditors insist that the trustees should

be charged to a greater amount than they are charged by the master in his report.

1. The creditors claim that the trustees should be held responsible for eighty-four shares in the stock of the Taunton Manufacturing Company, embraced in the assignment and valued at $58,906·25. It appears by the facts reported, that, at the time of the assignment, these eighty-four shares were pledged to Willard and West for $8500. The trustees had no money or means with which to redeem them; and, in point of fact, the shares never were redeemed, but were subsequently sold, for a price considerably less than the sum for which they were pledged; so that the right of redeeming them, which was all that the trustees took under the assignment, was utterly worthless. The master reported, that the trustees were no further accountable in respect to these shares; and we are of opinion, that the decision was correct, and must be affirmed.

2. The creditors demand, that the trustees should account further for two hundred shares in the Cohannet Bank. It appears, by the assignment, that two hundred shares of this stock were conveyed to the trustees, subject to a lien thereon by the bank for $10,000. The master discharged the trustees from their liability to account therefor, on the ground, that the shares did not stand in the names of Crocker and Richmond. But the court are of opinion, that the trustees are chargeable with the par value of these shares, subject to the charge of $10,000, in favor of the bank. It is true, the stock did not stand in the names of Crocker and Richmond, but had been transferred to Milton Barney, to be held by him in trust for the bank, to secure the $10,000, and as to the residue for Crocker and Richmond, as the general owners thereof, subject to the lien of the bank. Crocker and Richmond were recognized as the general owners, and received the dividends. One hundred of these shares were afterwards applied to pay the debt of $10,000, for which they were pledged, and the residue went to the use of Crocker and Richmond. All the facts, respecting the ownership of these

shares, were well known to the trustees. We are therefore of opinion, that the exception to the master's report, discharging them from their liability for these shares, must be sustained, and that the trustees must be charged therewith. There is nothing in the case to show that they could not, at any time, have applied a part of the shares, as they were afterwards applied, to discharge the lien, and thus have enabled themselves to hold the residue of the stock for the purposes of the trust; and we think it was their duty to have done so.

3. The creditors require the trustees to account for twenty-four shares in the Weymouth Iron Company. It appears, that, at the time of the assignment, Crocker and Richmond had subscribed for twenty-four shares in the stock of this company, and had advanced $3600 thereon, but that the certificates thereof had not been issued; and that their interest in the shares was included in the assignment, which provided that the certificates, when issued, should be delivered to the trustees. This company was successful, and the right to these shares was afterwards sold by Crocker and Richmond at an advance. It is not shown, that the trustees ever asked for these certificates, or gave notice to the company of the transfer to them, or took any means to avail themselves of this interest of $3600. The court are of opinion, that the trustees are liable to be charged for this item, as a part of the trust fund, and that the decision of the master, exempting them from all liability therefor, must be reversed, and the exception to that part of his report sustained.

VIII. The master proceeds to consider the trustees' account and answer, in which they pray to be exempted from further accounting for certain items of property, on the ground, that the property was of no value. Two items only are now in question:

1. One hundred and twenty shares in the stock of the Bristol Print Works;

2. One hundred and forty shares in the stock of the Taunton Iron Company.

In regard to these shares, it appears, that the corporation known as the Bristol Print Works was embarrassed; and that the shares therein could not be sold, and were utterly worthless.

The creditors contend, that, according to the terms of the trust deed, there was a breach of the condition in July, 1839, in consequence of the non-payment of some of the first instalment notes; and that thereupon it became the duty of the trustees immediately to sell all the trust property, and that failing to do so, they must be held responsible for its market value at that time.

But the court cannot sanction this conclusion. It does not appear, that there was any breach of the condition in July, 1839, or, if there were, that notice of it was given to the trustees; and, if a breach of the condition had then occurred, it was not the duty of the trustees to sell all the trust property, at the then market price, on pain of being held personally liable. Even after condition broken, some discretion was to be exercised by the trustees, as to the time and mode of sale, and they could only be held responsible for good faith and sound judgment.

Upon the facts, as reported by the master, the court are of opinion, that the shares in the Bristol Print Works, and also the shares in the Taunton Iron Company, became utterly worthless; and that the decision of the master, holding the trustees no further accountable therefor, was correct.

IX. The creditors also object to the claim of the trustees to be allowed the sum of $67,614, for that amount of the notes of Crocker and Richmond, taken up by the application of funds advanced by the trustees to Crocker and Richmond, to enable them to pay the first instalment notes.

The first item, in the trustees' account of payments and expenses, is a charge of $67,642·20, for that amount of Crocker and Richmond's first instalment notes, "taken up by sale of Taunton Railroad and Taunton Iron Company's stock," which, being diminished by $28·20, paid by Crocker and Richmond, leaves an item of $67,614.

This sum exactly corresponds with the first two items in the account of sales of trust property, namely, eighty-one shares Taunton Railroad, $7614, and sixty shares Taunton Iron Company, $60,000, making together $67,614.

It appears, by the master's report, that the real transaction was as follows. When the time of payment of the first instalment notes drew near, Crocker and Richmond applied to the trustees to release a part of the property in their hands, in order to enable them to meet this first instalment. After some hesitation, the trustees acceded to the request and did release to Crocker and Richmond eighty-one shares of the Taunton Railroad stock, valued at $7614, and sixty shares in the Taunton Iron Company, valued at $60,000; upon the understanding, that Crocker and Richmond should place in their hands an equal amount of notes given by Crocker and Richmond for their first instalment. After payment of the instalment, by Crocker and Richmond, these notes were selected by the book-keeper, not as the notes specifically paid by these funds, but as a part of the aggregate of notes, to secure which the deed was given.

Now, with the view which the court take of this deed, this was a misapplication of the funds by the trustees, for which they must be held answerable. It was not an application under the trust or authorized by it; it was made before the payments became due, and of course before any breach of condition; and it was not paid to the creditors, but to Crocker and Richmond, who paid the notes to the creditors, as, by the terms of the deed, they were bound to do. In every point of view, in which we can consider the subject, these transfers of shares to Crocker and Richmond were not under and in pursuance of the trusts of the deed, but in violation thereof; and the court are therefore of opinion, that the trustees are liable to account for these shares, and that the decision of the master in that respect must be reversed.

At the same time, however, it is proper to consider, that the real ground on which the trustees are chargeable is, that without just authority they parted with a portion of the

trust property. It appears, that a part of this property consisted of sixty shares in the Taunton Iron Company, valued at $60,000. But, from other parts of the case, it appears, that the trustees were not bound, if indeed they were authorized, to sell these shares at that time; and that the shares soon declined in value, and ultimately became utterly worthless; so that if the trustees had retained them, they would have been of no more value than the one hundred and forty shares which they did retain. If this be a true view of the facts, as we think it is, then, as to these sixty shares, the trustees are responsible; but if the stock were of no real value, their parting with the shares in the manner stated did not diminish the fund, and their liability for the same is consequently merely nominal.

There is nothing in the case to show, that the Taunton Railroad shares were not of the full value, at which they were estimated, and for this amount the trustees are answerable.

X. Another question, arising on the report, respects the compensation claimed by the trustees. In the first place, they claim an allowance for services under the first assignment. The master reported against their claim for an allowance on that ground; and, upon a review of the case, the court are of opinion, that this decision was right.

The trustees also preferred a claim for services under the last assignment, a part of which has already been paid out of the fund. The master allowed their claim. Upon a review of the whole case, the court are of opinion, that the sums allowed are too high, and that, instead thereof, the sum of $5000 be allowed to the trustees for their services, and credited to them in their account.

It should be added, in reference to the claim of the trustees to be allowed for notes paid and taken up by them out of the trust fund, that we have proceeded on the ground that they advanced money, before a breach of the condition, to Crocker and Richmond, to enable them to take up their notes. But if, in point of fact, after a breach of the condition, the trustees themselves paid and took up notes, secured by the mortgage

and trust fund, they would then stand on a very different footing. Perhaps it would be injurious to other creditors, to allow them in full, because it was their duty to distribute the fund equally, if it were not sufficient to pay all in full, and a payment to one creditor, of more than his distributive share, would be in their own wrong.

But we think that such notes should be proved, and that if the amount was received of the trustees, it must be con sidered as a payment by them in their own money, and they must account for the excess. But as the facts are not stated, this suggestion is made by way of caution, and with a view to a future inquiry, whether any such payments have been made.

A decretal order, in conformity with the foregoing opinion, was drawn up accordingly, and entered in the cause, by order of the court.